**Judie C. FLORENZANO, individually and as parent and natural guardian of Ashle E. Florenzano and Zachary B. Florenzano, Respondent,**

v.

**Frederick OLSON and Bankers Life Company, Petitioner, Appellants.**

No. C1–84–436.

Supreme Court of Minnesota.

May 9, 1986.

---

George G. Eck, Roy S. Ginsburg, Minneapolis, for appellants.

Samuel D. Orbovich, Bloomington, for respondent.

WAHL, Justice.

The gist of this case is whether the tort found by a Hennepin County District Court jury to have been committed by Frederick Olson, insurance agent for Bankers Life Company, against Judie Florenzano, was fraudulent misrepresentation or negligent misrepresentation and whether the principles of comparative negligence apply.

The jury found Olson and Bankers Life liable for misrepresentations regarding Florenzano's social security benefits, found Florenzano's damages to be $187,281.31 because of lost social security disability benefits, but also determined that Florenzano was 62.5 percent negligent in the case. The trial court applied comparative fault principles and entered judgment for Olson and Bankers Life. Florenzano appealed on the ground she had pleaded and proved fraudulent misrepresentation and that comparative fault should not have been applied to an intentional tort. The Court of Appeals reversed, holding that comparative fault does not apply to an action for negligent misrepresentation, which it accepted as the basis of the jury's findings. *Florenzano v. Olson*, 358 N.W.2d 175 (Minn.Ct. App.1984). The case was remanded for a new trial. Florenzano appeals the remand for a new trial on liability for fraud. Olson and Bankers Life appeal the decision that comparative fault does not apply to this case. For reasons set forth below, we reverse.

Judie Florenzano became totally disabled in 1977 because of multiple sclerosis. Neither she nor her two minor children are eligible for social security disability or de-

pendent benefits otherwise payable for her condition because, in 1973, Florenzano withdrew from participation in the social security program, allegedly on Olson's advice. She seeks to recover the present value of the lost benefits. Olson does not deny making the statement, but denies it was a fraudulent misrepresentation.

In the spring of 1973, Judie Florenzano and Joe Florenzano, her husband, bought their first home. They were twenty-six year old college graduates, in good health, with one small child. Judie Florenzano was employed as head psychiatric nurse at Metropolitan Medical Center (MMC); Joe Florenzano was employed in the Employee Relations Department of American Hoist and Derrick. Soon after the purchase of their home, the Florenzanos received a postcard from Olson, an agent of Bankers Life Company, offering a free gift for the opportunity to meet with them and discuss mortgage insurance. Bankers Life mass-mailed such cards to people who had obtained mortgages. The Florenzanos met for the first time with Olson in their home in June 1973 to discuss mortgage insurance in the form of life insurance for Joe Florenzano. The couple also discussed mortgage insurance protection with agents from two other insurance companies. At a second meeting with Olson, in August, they purchased a life insurance policy. They testified they bought the policy from Olson, even though the price he quoted was not the lowest, because they were impressed by his confident manner, apparent knowledgeability, and successful appearance. According to Joe Florenzano, Olson told them he had belonged to an honorary organization for high sales achievers, the Million Dollar Club, for the last 5 years he was employed as an insurance agent. In fact, at that time, Olson had worked as an insurance agent for 2 years and at Bankers' Life for approximately 6 months. He was not a member of the Million Dollar Club.

At Olson's second meeting with the Florenzanos, the couple not only purchased the mortgage insurance policy, but also provided Olson with extensive information for a comprehensive financial and insurance analysis he planned to prepare for them. This analysis, offered free of charge, was a sales tool used by Bankers Life agents to gain the trust and confidence of prospective clients. Olson needed to obtain the Florenzanos' social security earnings records to prepare the analysis, but he had forgotten the necessary authorization forms, so he met a third time with the couple in early September to obtain the signed authorizations.

During this period of time, Judie Florenzano, as an employee of one of two hospitals that were merging, was faced with a decision about her continued participation in the social security system. Hospital employees were offered three options:

Choice A To leave all social security contributions made while at MMC in the system and continue to participate in the social security system in the future;

Choice B To obtain a refund of all social security contributions made while at MMC and not participate in the system in the future;

Choice C To obtain a refund of all social security contributions made while at MMC but participate in the system in the future.

The hospital provided its employees written memoranda and information pamphlets about the decision. These materials warned employees that by choosing total or partial withdrawal (Choices B or C), "a type of Social Security benefit that might otherwise be payable to you, your spouse, your dependents, etc. may be totally lost or reduced in amount." The hospital also scheduled two employee meetings with social security administration representatives and gave employees the social security office telephone number to contact for further information. Employees had to make their decisions by September 10, 1973. Judie Florenzano testified she read the materials, attended an employee meeting, and discussed the choices with other employees. She did not telephone the social security office. She also took the materials home

and discussed the matter with her husband. The Florenzanos tentatively selected Choice C, or partial withdrawal but future participation in the social security system.

At the third meeting with Olson, Joe Florenzano brought up the subject of the choice Judie Florenzano must make, explained the couple's tentative decision, and asked Olson which option Judie Florenzano should select. The Florenzanos testified that Olson responded that this was a "once-in-a-lifetime" opportunity, and told them that they would be "fools" to select anything but total withdrawal. Olson explained to them, the couple testified, that if Judie Florenzano withdrew, she would be covered anyway by her husband's social security contributions. The Florenzanos testified they did not understand differences between kinds of social security benefits at that time, and asserted that in making his recommendation, Olson did not mention any such distinction.

Olson testified he recommended the withdrawal based on "some knowledge" about social security acquired through informal sales training programs at Bankers Life. He said he was aware there were "a number of benefits" in the social security program, but conceded he did not research or verify the basis of his advice either before or after he counseled the Florenzanos. Olson explained that in 1973, it was his understanding that, in the context of retirement benefits, if Joe Florenzano continued making maximum contributions, Judie Florenzano, as a working wife, would not receive any additional social security retirement income from her own contributions. There was expert testimony that Olson's view was correct, given certain assumptions about marital stability, a couple's work history, and wages earned, but only as to retirement benefits.

After this meeting with Olson, the Florenzanos talked further, changed their earlier decision, and selected Choice B, or total withdrawal, as the agent had recommended. Both testified they relied on Olson's advice in reaching that decision. After September 10, 1973, Judie Florenzano no longer contributed to social security. Four years later, she was diagnosed as having multiple sclerosis and has been totally disabled since August 1977. The parties agree that had she continued to participate in the social security system, she and her children would have been eligible for those benefits from January 1978 to the present.

## I.

In this action for misrepresentation, the issue is whether the trial court erred in applying the principles of comparative responsibility.[1] Our decision on this issue rests on our characterization of the gravamen of Florenzano's cause of action. Florenzano claims she pleaded, tried, and proved Olson's liability for fraudulent misrepresentation. By contrast, the trial court and the court of appeals determined the legal basis of her claim was negligent misrepresentation, not fraudulent misrepresentation.

Fraud is, as we have noted, "a protean legal concept, assuming many shapes and forms." *Jacobs v. Farmland Mutual Insurance Co.*, 377 N.W.2d 441, 444 n. 1. (Minn.1985). As Professor Prosser has written, "[t]here has been a good deal of overlapping of theories [of liability for misrepresentation], and no little confusion, which has been increased by the indiscriminate use of the word 'fraud', a term so vague that it requires definition in nearly every case." W. Prosser, Law of Torts § 105, at 684 (4th ed.1971) (footnote omit-

1. The trial court applied the Comparative Fault Act, Minn.Stat. § 604.01 (1984), to apportion liability between the parties in the percentages found by the jury. The Comparative Fault Act was enacted in 1978 and applies to causes of action that arose on or after April 15, 1978. Act of April 5, 1978, ch. 738 § 11, 1978 Minn. Laws 836, 842. The parties have stipulated that Flo-

renzano would have been eligible to receive disability benefits starting January 1978 had she continued to participate in the social security system. Thus, the statute in effect when Florenzano's cause of action accrued was the Comparative Negligence Act, Minn.Stat. § 604.01 (1976). Hereinafter, we will discuss that statute as the applicable one.

ted). Because fraud, in its broadest form, can be understood to encompass actions that result from both deceit and negligence, the line between the two theories of culpability can sometimes disappear.

 In Minnesota, an actionable misrepresentation requires proof either that the misrepresenter acted dishonestly or in bad faith, i.e. with fraudulent intent, or, alternatively, that the misrepresenter was negligent. These two theories of fault support causes of action that, as this case's ultimate holding demonstrates, may carry different legal consequences. Under neither theory, however, is one held to warrant the truth of all statements made. A good faith, non-negligent mistake is not the basis of liability for misrepresentation in this state.

 Fraud is distinguished from negligence by the element of scienter required.[2] Fraud is an intentional tort and scienter is an essential element. *Humphrey v. Merriam*, 32 Minn. 197, 198, 20 N.W. 138 (1884). We have stated that a representation is made with fraudulent intent when it is known to be false or, in the alternative, when it is asserted as of the representer's own knowledge when he or she does not in fact know whether it is true or false. *Davis v. Re-Trac Manufacturing Corp.*, 276 Minn. 116, 117, 149 N.W.2d 37, 39 (1967). This formula can be ambiguous. Whereas the words "fraudulent intent" naturally connote purposeful dishonesty, we have held that even if a misrepresentation is made without purpose to deceive or without knowledge of its falseness, "[t]he fraud is as great as if the party knew his statement to be untrue." *Bullitt v. Farrar*, 42 Minn. 8, 11, 43 N.W. 566, 567 (1889). Elsewhere we have stated, "A bad motive is not an essential element of fraud." *Spiess v. Brandt*, 230 Minn. 246, 252, 41 N.W.2d 561, 566 (1950) (footnote omitted). The language of these cases, if read out of con-

text, could blur the meaning of the term "fraudulent intent" such that it is indistinguishable from the failure to use reasonable care required to prove liability in negligence.

 Fraudulent intent is, in essence, dishonesty or bad faith. What the misrepresenter knows or believes is the key to proof of intent. Wrongful intent, as a state of mind, is rarely proved directly, e.g. by an admission of bad faith, but is normally established through circumstantial evidence. P. Keeton, *Fraud: The Necessity for an Intent to Deceive*, 5 U.C.L.A. L.Rev. 583, 584 (1958). There is no doubt of fraudulent intent when the misrepresenter knows or believes the matter is not as he or she represents it to be. Fraudulent intent is also present when a misrepresenter speaks positively and without qualification, but either is conscious of ignorance of the truth, or realizes that the information on which he or she relies is not adequate or dependable enough to support such a positive, unqualified assertion. Our explication of the states of mind that constitute fraudulent intent parallels that of the Restatement (Second) of Torts. Under the Restatement formulation, a misrepresentation is made with fraudulent intent if the maker:

(a) knows or believes that the matter is not as he represents it to be,

(b) does not have the confidence in the accuracy of his representation that he states or implies, or

(c) knows that he does not have the basis for his representation that he states or implies.

Restatement (Second) of Torts § 526 (1977). In ordering one's conduct, what these formulas mean is that a person, aware that a representation is or may be untrue, would disclose doubt or would disclose the source or limitation of the information on which his or her representation relies. W.P. Kee-

---

**2.** The term "fraudulent intent" is often used in the cases rather than "scienter" when referring to the misrepresenter's knowledge of the untrue character of his or her representations. When the term "fraudulent intent" is used, it should not be confused with the intent and expectation of influencing the other's conduct by the representation that is also an essential element of fraud. *See Davis v. Re-Trac Manufacturing Corp.*, 276 Minn. 116, 149 N.W.2d 37 (1967).

ton, *Actionable Misrepresentation*, 1 Okla. L.Rev. 21, 26 (1948).

▮ Nonetheless, a claim to an honest belief that what is false is true is not automatic protection from liability in fraud, if that claim is, under the circumstances, completely improbable. In such a case, logical probability leads to a jury inference of dishonesty, despite the represener's protestations. Keeton, *Fraud, supra,* at 584. But the unreasonableness of the misrepresenter's belief does not conclusively lead to an inference of bad faith. It may merely prove forgetfulness or carelessness sufficient to establish liability in negligence.

▮ A misrepresentation is made negligently when the misrepresenter has not discovered or communicated certain information that the ordinary person in his or her position would have discovered or communicated. Proof of the subjective state of the misrepresenter's mind, whether by direct evidence or by inference, is not needed to prove negligence. Negligence is proved by measuring one's conduct against an objective standard of reasonable care or competence. In Minnesota, one making representations is held to this duty of care only when supplying information, either for the guidance of others in the course of a transaction in which one has a pecuniary interest, or in the course of one's business,

profession or employment. *Bonhiver v. Graff,* 311 Minn. 111, 122, 248 N.W.2d 291, 298–99 (1976).[3]

▮ In the case before us, Florenzano set out her complaint in terms of fraudulent misrepresentation, "Olson made the representation knowing it to be false or asserting it without knowledge of its truth or falsity * * *." These are the words defining the element of fraudulent intent in *Davis v. Re-Trac,* 276 Minn. at 117, 149 N.W.2d at 39 ("The representer must know it to be false, or in the alternative, must assert it as of his own knowledge without knowing whether it is true or false.")[4]

In closing argument defendants' attorney conceded that "[p]laintiffs have tried this [case] on the theory of what's generally known as intentional misrepresentation, fraud." He argued, however, that the case was more properly to be characterized as negligent misrepresentation. Plaintiffs' attorney argued that, though plaintiffs did not contend that Bankers Life was a bad company or that Olson was a bad man, the jury instructions would refer to the term fraud, a term with a broad legal meaning. "The judge will instruct you," he said, "that it was not necessary that a misstatement was intentionally made, that if an individual made a misstatement without knowledge of its truth or falsity, that is

---

3. In *Bonhiver,* we adopted the Restatement (Second) of Torts definition of negligent misrepresentation:

"(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."
Restatement (Second) of Torts § 552 (Tent. Draft No. 12 1966).

4. The elements of fraudulent misrepresentation are:
1. There must be a representation;
2. That representation must be false;
3. It must have to do with a past or present fact;

4. That fact must be material;
5. It must be susceptible of knowledge;
6. The representer must know it to be false, or in the alternative, must assert it as of his own knowledge without knowing whether it is true or false;
7. The representer must intend to have the other person induced to act, or justified in acting upon it;
8. That person must be so induced to act or so justified in acting;
9. That person's action must be in reliance upon the representation;
10. That person must suffer damage;
11. That damage must be attributable to the misrepresentation, that is, the statement must be the proximate cause of the injury.
*Davis v. Re-Trac,* 276 Minn. at 117, 149 N.W.2d at 38–39 quoting *Hanson v. Ford Motor Co.,* 278 F.2d 586, 591 (8th Cir.1960).

sufficient to constitute fraud under the law."

At trial, Florenzano presented evidence going to all elements of intentional misrepresentation. The defendants presented evidence to show Olson's statements were true or were statements of opinion, and evidence to show Florenzano was negligent in exercising her choice of options. The special verdict form submitted to the jury asked, in reference to Olson's conduct, about each element of intentional misrepresentation. The jury was asked about negligence in the context of Florenzano's conduct. The trial court instructed the jury on all the terms used in each part of the special verdict form. Further, the court instructed, "[t]he word fraud is sometimes used in a very broad sense so as to include all acts or omissions which involve a breach of legal duty and are injurious to the rights of others. The word 'duty' * * * that which a person owes to another * * * is commonly reserved * * * [for] obligations of performance * * * which rest upon a person in an official or fiduciary capacity * * * [and] includes such offices or relations as those of attorney at law, guardian, executor or broker, a director of a corporation and a public official." Thus, fraud was defined to the jury to include both intentional and negligent misrepresentation. There were no objections of record to the court's instructions.

■■■■■ In returning the verdict, the jury answered "yes" to all questions needed to establish Olson's liability under an intentional theory. Question #5 asked "[D]id Mr. Olson know the fact to be false, or in the alternative assert it as of his own knowledge without knowing whether it was true or false?" By answering yes, the jury established the basis of liability as fraudulent misrepresentation under *Davis v. Re-*

*Trac, supra.* The only facts in this case that support a finding that Olson made an actionable misrepresentation, however, are those facts which go to prove that, as the Florenzano's insurance agent and would-be financial adviser, he had, in the course of his business or employment, supplied them with false information on which they justifiably relied to their pecuniary loss, and that he had failed to exercise reasonable care or competence in obtaining or communicating the information. The same representations, if made by a stranger off the street or the next-door neighbor, would be nothing more than gratutitous advice on which the Florenzanos could not reasonably rely. We hold, therefore, that, on the facts of this case, the only basis for liability was negligent misrepresentation. The evidence does not, as a matter of law, either directly show or support an inference that Olson knew the fact to be false. The jury must necessarily have found, therefore, that he asserted the fact of his own knowledge without knowing it to be true or false.[5] Such a finding is not inconsistent with our holding that this was negligent, not fraudulent misrepresentation.

## II.

■■■■ We come now to the question that prompted this court to accept review in the first place. Do the principles of comparative responsibility, as set out in the Comparative Negligence Act, apply to negligent misrepresentation? This is a case of first impression in our state. Without question, principles of comparative negligence would not apply to an intentional tort; we have never so applied them. *See Schulze v. Kleeber*, 10 Wis.2d 540, 545, 103 N.W.2d 560, 564 (1960) adopted by virtue of *Marier v. Memorial Rescue Service, Inc.*, 296 Minn. 242, 207 N.W.2d 706 (1973).[6] Where

---

5. When a misrepresentation claim is presented to the jury on both intentional and negligent theories, separate interrogatories on the element of intent should be submitted, asking: (1) did the defendant know the facts to be false?; if not, (2) did the defendant assert the fact as of his or her own knowledge without knowing it to be true or false?

6. In *Marier*, we observed that Minnesota's comparative negligence statute was based on that of Wisconsin and we stated that, when we adopt a statute from another state which has been interpreted by the highest court of that state, we ordinarily take the interpretation with the statute up to the time of the adoption of our statute. 296 Minn. at 244–45, 207 N.W.2d at 708, citing

society wants certain conduct absolutely prohibited and discouraged, apportionment of fault is not appropriate.[7] Where the tort is not intentional, however, the answer may be different.

The Court of Appeals declined to apply comparative negligence to cases of negligent misrepresentation, relying on the rationale of the California Court of Appeals in the case of *Carroll v. Gava*, 98 Cal. App.3d 892, 159 Cal.Rptr. 778 (1979). *Florenzano v. Olson*, 358 N.W.2d 175, 176–77 (Minn.Ct.App.1984). The majority of other states considering the issue disagree and have held principles of comparative responsibility applicable to cases of negligent misrepresentation. *See, e.g., Robinson v. Poudre Valley Federal Credit Union*, 654 P.2d 861 (Colo.Ct.App.1982), *appeal after remand*, 680 P.2d 241 (Colo.Ct.App.1984); *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127 (Tenn.Ct.App.1982). This is also the view of respected commentators, including the Restatement (Second) of Torts. "The recipient of a negligent misrepresentation is barred from recovery for pecuniary loss suffered in reliance upon it if he is negligent in so relying." Restatement (Second) of Torts § 552A (1977). Professor Prosser states that there is "no apparent reason for distinguishing negligent misrepresentation from any other negligence in [the application of contributory or comparative negligence concepts]." W.

Prosser, Law of Torts § 107, at 706 (4th ed.1971).

 We agree with these commentators and with the majority of states that have considered the issue. This court has long favored the concept of comparative negligence as a just way to apportion liability. We applied the Comparative Negligence Act expansively, even extending it to many causes of action not traditionally within the scope of negligence.[8] We hold that the principles of comparative responsibility apply to negligent misrepresentation and that the trial court appropriately applied those principles in this case. We reverse the decision of the Court of Appeals and reinstate the judgment of the trial court.

Reversed.

SIMONETT, J., concurs specially.

SIMONETT, Justice (concurring specially):

The majority opinion, as I read it, holds that (1) comparative negligence does not apply to an intentional tort; (2) plaintiffs failed to prove intentional fraud as a matter of law; and (3) while negligent misrepresentation was proven, comparative negligence applies, and the jury's verdict putting 62.5% negligence on plaintiff precludes plaintiffs' recovery. I join in the result reached by the majority and in its essential

Olson v. Hartwig, 288 Minn. 375, 377, 180 N.W.2d 870, 872 (1970). The Wisconsin Supreme Court determined in 1960 that contributory negligence was not a defense to an intentional tort. *Schulze v. Kleeber*, 10 Wis.2d at 545, 103 N.W.2d at 564.

7. It is the rule of law in virtually all states that fault should not be apportioned between an intentional tortfeasor and a merely negligent victim. *See* W. Prosser, Law of Torts § 65, 426 (4th ed.1971). The reasons underlying this rule are persuasive. Intentional torts are punished not because the actor failed to use reasonable care, but because the actor intended the act. The difference between the victim's actions and the defendant's action is not one of degree, but of kind, and they are therefore not comparable. *Id.;* Note, *The Scope of Comparative Fault in Minnesota*, 9 Wm. Mitchell L.Rev. 299, 321–22 (1984); *See also* Restatement (Second) of Torts § 545A (1977) (contributory negligence not a

defense to action of fraudulent misrepresentation). We also consider it bad policy to permit an intentional tortfeasor the defense of comparative negligence merely because he or she chooses a gullible or foolish victim. "No rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool." *Chamberlin v. Fuller*, 59 Vt. 247, 256, 9 A. 832, 836 (1887). "[I]f the representations were willfully false, it does not lie in the vendor's mouth to say that the vendee ought not to have relied upon them." *Wilder v. DeCou*, 18 Minn. 470 (Gil. 421, 431) (1871).

8. *See, e.g., Jack Frost, Inc. v. Engineered Building Components Co., Inc.*, 304 N.W.2d 346 (Minn. 1981) (strict liability); *Leskey v. Heath Engineering Co.*, 293 N.W.2d 39 (Minn.1980) (products liability); *Scott v. Independent School Dist. No. 709*, 256 N.W.2d 485 (Minn.1977) (nonabsolute statutory liability); *Price v. Amdal*, 256 N.W.2d 461 (Minn.1977) (wrongful death).

holdings, but because the subject is important, with consequences yet to be seen, and because my approach differs in some respects, I take this occasion to write. The majority opinion, prudently, leaves to another day a further formulation of the concept of intentional misrepresentation. Yet, it seems to me, that formulation is very much implicated here and it might be useful to say something more, if not to provide a solution, at least to point out where the problems lie.

Plaintiffs' complaint alleged false misrepresentations, and the case was submitted to the jury on the definition of fraudulent misrepresentation given in *Davis v. Re-Trac Manufacturing Corp.*, 276 Minn. 116, 117, 149 N.W.2d 37, 38 (1967), wherein "fraudulent intent" has a double meaning, *i.e.*, either the representer "must know it [the representation] to be false, or in the alternative, must assert it as of his own knowledge without knowing whether it is true or false." The second definition permits a finding of fraudulent misrepresentation where there is no intent to deceive. Thus we have said the term fraudulent intent "is used in a highly technical sense, quite different from its ordinary, literal meaning." *Hollerman v. F.H. Peavey & Co.*, 269 Minn. 221, 230, 130 N.W.2d 534, 541 (1964) (footnote omitted).

If we now accept, as we do, the proposition that comparative negligence does not apply to intentional torts, then the question arises: When is a fraudulent misrepresentation deemed to be intentional for the pur-

pose of determining whether comparative negligence or fault applies? If there is an intent to deceive, plainly we have an intentional tort to which comparative responsibility is inapplicable. But what if the defendant asserts a fact as of his own knowledge without knowing whether it is true or false? I read the majority opinion to say this would not be an intentional tort, and with this I agree.

It seems to me that under the broad category of fraud we have three types of actionable misrepresentations: the first is deceit;[1] the second, for want of a better name, I will call reckless misrepresentation;[2] and the third is negligent misrepresentation.[3] The first two types have always been combined under the *Davis v. Re-Trac* formulation, but now, because of the enactment of Minn.Stat. § 604.01 and today's holding, they must be separated at least for the purpose of determining whether comparative negligence or fault applies.[4]

In my view, comparative responsibility would apply to both reckless and negligent misrepresentation but not to deceit. The dividing line is the "intent to deceive" which distinguishes deceit from the other two torts and which makes deceit a true, not a fictional, intentional tort. Reckless and negligent misrepresentations are alike in that they both judge the representer's state of mind by an objective standard of due care and, therefore, the conduct of the representer and the conduct of the person to whom the representation is made lend

1. I would define deceit as a purely intentional tort, with its "ordinary, literal meaning," *i.e.*, where the representer knows his representation is false. In other words, I would limit intentional misrepresentations to those cases where there is an intent to deceive, where, to put it plainly, the representer is lying. I do not find the three- or four- part definition of fraudulent intent in Restatement (Second) of Torts § 526 (1977) (*see* slip op. at 8) helpful because, like the *Davis v. Re-Trac* formulation, it includes both intentional and unintentional conduct. Like *Davis v. Re-Trac*, the Restatement formulation was drafted before comparative responsibility and without consideration of the consequences of applying comparative responsibility to unintentional misrepresentations.

2. A reckless misrepresentation occurs when the representer asserts a fact as of his own knowledge without knowing whether it is true or false.

3. A negligent misrepresentation is the kind described in *Bonhiver v. Graff*, 311 Minn. 111, 122, 248 N.W.2d 291, 298–99 (1976). *See* Restatement (Second) of Torts § 552 (1977).

4. Although this case does not involve comparative fault, under Minn.Stat. § 604.01, subd. 1a (1984), "fault" now includes "acts or omissions that are in any measure negligent or reckless."

themselves to comparison.[5] As the majority opinion points out, a deceiver's conduct is different in kind from the reckless or negligent misrepresentation, more reprehensible, and it would be "bad policy" to let the deceiver ameliorate his deception by urging that his victim should share the harm which the deceiver alone chose to create. At 175, footnote 7. The same policy arguments against applying comparable responsibility do not apply to reckless and negligent misrepresentations. I suppose there will be some instances of misrepresentations made so recklessly that one might argue they should be lumped with intentional misrepresentations to which comparative fault does not apply. This argument, however, ignores that the reckless misrepresenter's fault, no matter the degree, is still different in kind from that of the deceiver. As a practical matter, a jury can easily handle these cases, either by finding deceit or by finding a reckless misrepresentation with 100% of the fault on the representer. In either case, there is no discount for comparative fault.

In *Davis v. Re-Trac*, 276 Minn. at 118–19, 149 N.W.2d at 39, this court, citing *Greear v. Paust*, 192 Minn. 287, 256 N.W. 190 (1934), said, "But where, as here, a party to whom a representation has been made has not made an investigation adequate to disclose the falsity of the representation, the party whose misstatements have induced the act cannot escape liability by claiming that the other party ought not to have trusted him." The actual statement in *Greear*, however, is, "[O]ne who has *intentionally deceived* another to his injury cannot make the defense that such other party ought not to have trusted him." *Id.*, 192 Minn. at 294, 256 N.W. at 193 (emphasis added). *See also Maxfield v. Schwartz*, 45 Minn. 150, 151, 47 N.W. 448, 449 (1890) (cited in *Greear*) ("While in the ordinary business transactions of life men are expected to exercise reasonable prudence, and not to rely upon others, with whom they deal, to care for and protect their interests, this requirement is not to be carried so far that the law shall ignore or protect *positive, intentional fraud* successfully practised upon the simple-minded or unwary." (Emphasis added.)). It seems clear that before *Davis v. Re-Trac* this court had excused a fraud victim from any duty to investigate a representer's statements only in cases of intentional fraud. *Davis v. Re-Trac* seems to extend this rule to unintentional fraud. Now that comparative responsibility has softened the harshness of the old contributory negligence rule, I would limit any instruction about a plaintiff not having a duty to investigate a representation to cases of deceit where it was originally intended only to apply.[6]

One other comment. Although using "intent to deceive" as the test for distin-

---

**5.** Negligent misrepresentation deals with the failure to exercise reasonable care or competence in supplying correct information resulting in pecuniary loss, and is confined to a business and professional consultant setting. Restatement (Second) of Torts § 552 (1977). A reckless misrepresentation deals with a false representation made recklessly or carelessly without regard for whether it is true or false. Thus the scope of liability for these two types of misrepresentation are different but the standard of care involved is the same or differs only in degree. The Florenzano claim, as the majority opinion points out, is really a claim for negligent misrepresentation. Plaintiffs, however, elected not to present a negligent misrepresentation claim, but, it seems to me, their claim was fairly enough presented under the trial court's instructions on reckless misrepresentation and standard negligence.

**6.** In this case, the jury was instructed, "It is no defense that the party defrauded might have learned the truth by seeking information from other available sources, but the party defrauded is not justified in relying upon its truth if its falsity is obvious." The jury was subsequently also given the standard negligence instruction on exercising ordinary care in the management of one's affairs. This, I think, explains how the jury could find Mrs. Florenzano was justified in acting on defendant's false representation and at the same time could find Mrs. Florenzano negligent in exercising her social security options.

Here the trial court, uncertain how the undecided issue of the applicability of comparative negligence would eventually be resolved, quite properly submitted the case on both the intentional and unintentional theories of recovery.

guishing between intentional and unintentional fraud gives us a bright line, the line may not be as bright as we would like. As the majority opinion observes, we must distinguish between an intent to deceive and proof of this intent. Proof of an intent to deceive is usually indirect and circumstantial. Proof that may directly establish a reckless (nonintentional) misrepresentation may also indirectly establish the requisite state of mind for a deceiver, depending on how the trier of fact weighs the evidence. One might have the situation—indeed, we have it in this case—where, on the same evidence, plaintiff claims the fraud was intentional while the defendant claims it was unintentional. In our case here, we are able to hold as a matter of law there was no intent to deceive, but in other cases there may be a jury issue.

In future cases where both deceit and reckless misrepresentation are submitted to the jury, I assume the trial court, in submitting the 11 elements of misrepresentation listed in *Davis v. Re-Trac*, may wish to separate the element of "fraudulent intent" into two questions, namely: (1) Did defendant know the representation to be false? and, if not, then (2) Did defendant assert the representation as of his own knowledge without knowing whether it was true or false? *See* 175, footnote 5. Only if the second question is answered yes would comparative negligence apply.