58 F.3d 1306
 EXETER BANCORPORATION, INC., a Minnesota corporation,
Plaintiff-Appellant,
v.
KEMPER SECURITIES GROUP, INC., a Delaware corporation, doing
business as Blunt Ellis & Loewi, Inc., a division
of Kemper Securities Group, Inc.,
Defendant-Appellee.
 No. 94-1996.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 17, 1994.
Decided July 3, 1995.
 
 Thomas P. Kane, St. Paul, MN, argued (William M. Tuttle, on the brief), for appellant.
 Richard G. Mark, Minneapolis, MN, argued (Charles B. Rogers and Janel E. Laboda, on the brief), for appellee.
 Before BEAM, Circuit Judge, CAMPBELL, Senior Circuit Judge,* and MORRIS S. ARNOLD, Circuit Judge.
 LEVIN H. CAMPBELL, Senior Circuit Judge.
 
 
 1
 On December 15, 1991, Exeter Bancorporation, Inc. ("Exeter"), an investment firm, brought this action in the district court against Blunt Ellis & Loewi ("BEL"), a division of Kemper Securities Group, Inc. ("Kemper").[1] Exeter and BEL had entered into a contract under which BEL agreed to help Exeter raise more than $4 million in capital. After the attempt to raise the capital failed, Exeter sued. The district court[2] granted summary judgment to BEL on all counts. Exeter now appeals. We affirm.
 
 I.
 
 2
 Exeter is an investment firm run by James Stolpestad and Elden Rance, two individuals with some experience in the banking and real estate industries. In late 1989, Stolpestad and Rance conceived of a plan to acquire four Minnesota banks. They signed letters of intent to purchase the banks in late 1989 and 1990; purchase agreements were executed by the spring of 1990. Needing to raise more than $4 million in capital to finance the acquisition, Stolpestad and Rance had earlier approached BEL, an investment bank, in November of 1989. After several meetings, BEL agreed to help Exeter raise the necessary capital.
 
 
 3
 Exeter and BEL entered into a letter of agreement in March of 1990. In the letter, BEL agreed to act as Exeter's exclusive financial advisor in its attempt to raise capital for this investment project. BEL agreed to assist Exeter in arranging the structure and placement of debt and equity financing. The contract contemplated the issuance of stock and the private placement of such stock. Either party could terminate the contract upon 30 days notice.
 
 
 4
 In April of 1990, according to Exeter, BEL Senior Vice President Jon Bruss met with Stolpestad and Rance and suggested that the stock be issued through a public offering, rather than through a private placement. Bruss argued that a public offering would expand the universe of investors and therefore increase the chances of the stock offering's success. Exeter agreed to the public offering, though it alleges that it did so reluctantly, concerned about the added cost and complexity that would be involved. Over the next several months, Exeter prepared the paperwork necessary for such a financing.
 
 
 5
 In August of 1990, BEL and Exeter entered into another letter of agreement, which explicitly superseded the earlier agreement and which reflected their decision to attempt to raise the money through a public rather than private offering. In this letter, BEL agreed to be Exeter's "exclusive financial advisor" with respect to the transaction and to assist Exeter in preparing the various necessary documents and filings. BEL also agreed to proceed with a "firm commitment" underwriting once the prospectus in the offering was approved by the SEC and became effective. Under such an arrangement, an underwriter agrees to purchase an issuer's shares after having had an opportunity to assess the interest in the market and after certain other conditions are met. The letter went on to state,
 
 
 6
 This letter does not constitute an agreement to underwrite securities, or an agreement to enter into any such agreement, but reflects our present intention of proceeding to work with you on the proposed financing. It does not constitute a commitment on the part of Exeter, Loewi or any other underwriter except as to assumption and payment of expenses as provided.
 
 
 7
 Under the agreement, BEL would not receive any underwriting fees or brokerage commissions unless the offering was successfully completed. BEL would be entitled, however, to recover certain expenses it incurred in preparing the public offering. The agreement was terminable at will.
 
 
 8
 Pursuant to the August 1990 letter, BEL and Exeter worked together to market the common stock to investors. In August of 1990, BEL's corporate finance committee drew up a marketing plan for the Exeter offering. Due to the small size of the offering and the nature of the banks to be acquired, BEL decided to market the stock primarily from its Minneapolis office to local and institutional investors who might have more of an interest in the venture. BEL also attempted to market the stock to institutional investors through its Milwaukee office. In October of 1990, fearing that the stock offering was not going well, Exeter asked BEL to sell the stock from its other offices. BEL, however, refused, concluding that there would be no interest in the offering from any other regions.
 
 
 9
 The marketing effort was ultimately unsuccessful, as BEL and Exeter were unable to find enough investors interested in buying the stock. According to Exeter, it failed because BEL was not sufficiently equipped to handle such a project and because BEL focused too narrowly on local investors only. According to BEL, the marketing effort--which Exeter knew would be difficult--failed for general lack of interest on the part of investors, exacerbated by the savings and loan crisis, the Persian Gulf war, and the recession.
 
 
 10
 Exeter terminated the agreement in November of 1990, after BEL refused Exeter's demand that it purchase the stock and underwrite the offering. At the time of the termination, the offering had not yet become effective under SEC authority. Exeter's subsequent efforts to place the stock itself ultimately failed. BEL sought compensation under the agreement for certain out-of-pocket expenses that it had incurred. Exeter subsequently brought this suit, seeking to hold BEL liable for the failure of the offering and its refusal to purchase and underwrite the stock. Exeter alleged the following state law claims: (1) breach of contract, (2) fraudulent misrepresentation, (3) fraudulent concealment, and (4) professional malpractice. BEL counterclaimed for its expenses. The district court entered summary judgment for BEL on all counts. This appeal followed.
 
 II.
 
 11
 Exeter argues on appeal that the district court erred in granting summary judgment against it on three of its four claims: fraudulent misrepresentation, fraudulent concealment, and professional malpractice. Exeter also appeals from the district court's entry of judgment on BEL's counterclaim for expenses under the contract. Exeter does not, however, appeal from judgment on its breach of contract claim. With respect to that claim, the district court held that under the terms of the August letter, BEL was under no obligation to purchase the stock and to underwrite the offering, since the offering had not yet become effective at the time of Exeter's demand. The court further held that BEL was under no implied obligation to use its best efforts to complete the offering. That BEL met all of its obligations under the terms of the contract is thus res judicata. The only causes of action on appeal come from outside that contract.
 
 
 12
 We review the district court's decision de novo, applying the same summary judgment standard. Johnson v. Enron Corp., 906 F.2d 1234, 1237 (8th Cir.1990). To prevail on a motion for summary judgment, the moving party must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. In reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-movant, drawing all reasonable inferences in its favor. AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir.1987). However, once the moving party has presented evidence indicating the lack of any genuine issue of fact, the non-moving party may not avoid summary judgment simply by presenting generalized and unsupported allegations; it must "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).
 
 A. Fraudulent Misrepresentation
 
 13
 Exeter argues that the district court erred in granting summary judgment against it on its claim of fraudulent misrepresentation. That claim was based on two allegedly fraudulent misrepresentations: (1) that BEL would use its "nationwide network" of offices to place Exeter's stock; and (2) that BEL had an investor "locked up" to buy more than $1.2 million in Exeter preferred stock. Under Minnesota law, proof of fraud requires a showing that the defendant:
 
 
 14
 made a false representation of a past or existing material fact, susceptible of knowledge, knowing it to be false or without knowing whether it was true or false, with the intention of inducing the person to whom it was made to act in reliance upon it or under such circumstances that such person was justified in so acting and was thereby deceived or induced to so act to his damage.
 
 
 15
 Berryman v. Riegert, 286 Minn. 270, 175 N.W.2d 438, 442 (1970). In order to survive BEL's motion for summary judgment, Exeter must have presented specific facts sufficient to raise a genuine issue of fact as to each of the above elements.
 
 1. Nationwide Network of offices
 
 16
 Exeter's basic assertions regarding the nationwide network amount to the following: (1) BEL officials represented to Exeter that BEL would market Exeter's stock through its nationwide network of offices; (2) BEL officials knew this to be false at the time they made the representations; (3) Exeter, reasonably relying the representation, agreed to work with BEL and to proceed with a public, rather than private, offering; and (4) Exeter suffered resulting damage when the stock, rather than being marketed nationwide, was marketed primarily through the Minneapolis office and the offering failed for lack of interest. In granting summary judgment to BEL, the district court held that Exeter had failed to present any evidence to support the first two of the above elements.
 
 
 17
 Exeter insists that the district court erred in concluding that it had presented no evidence in support of the first element: that BEL had promised it would use its nationwide network, rather than simply the Minneapolis office, to market the stock. Exeter points to three supporting pieces of evidence. The first is an early meeting with BEL's Minneapolis office manager Fran Braun, which Stolpestad described as follows:
 
 
 18
 "We're looking for an organization that is recognized as having expertise in raising money for financial institutions that has a network of offices through which the stock can be sold, that can get the job done for us," et cetera, et cetera and Mr. Braun in effect said, "We're your guys, we can probably do that for you, but you're talking to the wrong person. You really ought to talk to somebody from corporate finance. Let me call somebody from corporate finance for you."
 
 
 19
 Second, Exeter points to a promotional brochure given to Stolpestad and Rance during one of these early meetings. The brochure stated that BEL was a regional firm with 70 offices and more than 500 investment bankers. Exeter argues that the brochure led Stolpestad and Rance to believe that this entire network of offices would be used to place Exeter stock. Finally, Exeter points to deposition testimony by Stolpestad and Rance, in which they testify generally that, during the meetings leading up to the agreement with BEL and at the April 1990 meeting with Bruss, they were told that BEL would use its nationwide network.
 
 
 20
 As to the first element--BEL's alleged promise to use the network--we are persuaded that Exeter just barely presented sufficient evidence to survive summary judgment. The evidence of a promise is certainly minimal, but enough. Braun's statement, even viewed in the light most favorable to Exeter, could not reasonably be interpreted to be a promise, couched as it was in the vaguest of terms: "We're your guys, we can probably do it for you, but you're talking to the wrong person." Nor could the two-page promotional brochure be interpreted to be a promise, since it was obviously an advertisement and contained only the most general information about BEL's background and structure. Exeter did, however, present testimony from Stolpestad and Rance, who repeatedly stated that they were told BEL would use its nationwide network. Although most of these general assertions, which fail to identify who made the statement or when[3], are not specific enough to raise a genuine issue of fact, see Anderson, 477 U.S. at 250, 106 S.Ct. at 2511, there is one assertion that provides sufficient specificity and therefore precludes summary judgment. In his deposition, Rance testified about the April meeting with BEL Senior Vice President Bruss: "Well, they wanted to do a public offering, which was a total change. And we were concerned about doing a public offering. And [Bruss] said it wasn't a problem. They had all these offices; they had done numbers of transactions." (Emphasis added.). Viewing this statement in the light most favorable to Exeter, we conclude that a jury could reasonably infer that this constituted a promise to Exeter that BEL would use its nationwide network.
 
 
 21
 But Exeter founders on the next element. It argues that the district court erred in holding that, even if the statements were made, there was no evidence they were false when made. Exeter relies upon the deposition of Larry Hoffman, BEL's general sales manager, who testified that,
 
 
 22
 [BEL would] have depended very little on other offices other than the Minneapolis offering because a community offering such as this, that merchandise is only desirable within that immediate area. No other branch really is going to have any interest in it. Every town has got their own small bank that's trying to go public or sell shares.
 
 
 23
 Exeter also points to testimony by various BEL officials stating generally that the offices outside Minnesota would not typically be interested in this type of offering.[4] These statements are sufficient, Exeter argues, to suggest that BEL never intended to use its nationwide network to place Exeter stock, or at least that BEL was not sure whether it would use the network or not, and that BEL's statement was therefore false when made. See Florenzano v. Olson, 387 N.W.2d 168, 173 (Minn.1986) (finding fraud where statement made without knowledge of its truth or falsity). Exeter contends that it relied on BEL's false assurances in entering into the contract with BEL.[5]
 
 
 24
 But assuming what Bruss said can be interpreted as a promise, we agree with the district court that Exeter failed to make a sufficient showing that Bruss knew the statement was false when he made it in April of 1990. Under Minnesota law, a fraudulent misrepresentation must concern "a past or existing material fact," Berryman, 175 N.W.2d at 442; "a representation or expectation as to future acts is not a sufficient basis to support an action for fraud merely because the represented act or event did not take place." Vandeputte v. Soderholm, 298 Minn. 505, 216 N.W.2d 144, 147 (1974). It is true that, despite this limitation, a misrepresentation of a present intention, for example in a promise to do something prospectively, could amount to a fraud. However, the failure to carry out such a promise, with nothing more, does not constitute fraud; there must be affirmative evidence that, when the maker made the promise, he or she had no intention of keeping it. Vandeputte, 216 N.W.2d at 147. To survive summary judgment here, Exeter had to present evidence affirmatively indicating that, at the time Bruss allegedly stated that BEL would use its nationwide network, he knew BEL would not do so.
 
 
 25
 Exeter presented no such evidence. The testimony of the various BEL officers at best consisted of predictions that most of the interest in an offering of this type would come from Minnesota and that most of the work would accordingly be done by the Minneapolis office.[6] Reading the evidence in the light most favorable to Exeter, a jury could possibly infer that, like these other BEL officials, Bruss may have known that most of the interest in an offering of this type would come from local investors. From this, a jury might possibly infer that Bruss expected that most of the work would therefore be done by the Minneapolis office. But a jury could not reasonably infer from these two inferences that, at the time he made the alleged statements, Bruss did not believe that the other offices would assist, or be available as needed, to sell Exeter's stock. At the time Bruss allegedly made the statement in April, it was altogether possible that BEL would use the rest of the network to sell the stock. Exeter has presented nothing tending to show that BEL had already concluded at that point that it would not use the other offices. It is undisputed that BEL did not formulate its marketing strategy for the Exeter offering until August of 1990, nearly four months later. Exeter itself did not ask that the other offices become involved until October of 1990. The fact that BEL decided at that point that its other offices would not be interested in the Exeter offering does not, without more, make Bruss's alleged statement, made four months earlier, fraudulent. Bruss could have believed in good faith that the network would be used. To make it fraudulent, Exeter would have to present affirmative evidence that, at the time he made the statement, Bruss knew or believed that the other offices would not be available. Vandeputte, 216 N.W.2d at 147. Because Exeter has presented no such evidence, we hold that summary judgment on this issue was appropriate.[7]
 
 2. Locked Up Investor
 
 26
 Exeter argues that the district court erred in holding against it on the alleged statement that BEL had a "locked up" preferred investor. Exeter points to testimony from Stolpestad and Rance, who assert that they were repeatedly told, during the early meetings, that BEL had two investors ready to take a substantial portion of the stock, one of them "locked up" and ready to take $1.2 million in preferred stock. Both recount being told by Bruss in February about the locked up investor. Exeter contends that it relied upon this assertion in agreeing to work with BEL and later in agreeing to proceed with the public offering. By April or May, however, Exeter was told that there was no longer a locked-up preferred investor. Exeter argues that, because no investor ever materialized, that investor could not truly have been "locked-up" at the time the statement was made, and the statement was therefore false when made. At the very least, Exeter argues, this shows that BEL made the statement without knowing whether it was true or false.
 
 
 27
 We agree with the district court that Exeter has not presented evidence that the asserted statement regarding the locked up investor was known by BEL to be false when made. As stated, under Minnesota law, a representation or expectation of future events is not sufficient to support an action for fraud simply because the represented act or event did or did not take place. Vandeputte, 216 N.W.2d at 147; Berg v. Xerxes-Southdale Office Building Co., 290 N.W.2d 612, 615 (Minn.1980). BEL's alleged statement was essentially a representation about a future event: that an investor they knew would take $1.2 million in preferred stock. Exeter has presented no evidence that BEL did not believe this to be true at the time it made the statement. Indeed, Stolpestad testified that he thought BEL did in fact have an investor locked up at the time the BEL officials allegedly made the statement: "I frankly think what happened is that those players fell out of bed and he had to change the deal to get it done." That the investor may later have backed out does not make the earlier statement fraud, absent some evidence that BEL, when the statement was made, had reason to believe that the investor would not purchase the stock. As Exeter has presented no evidence that the statement was false when made, summary judgment was appropriate.
 
 
 28
 Exeter attempts to cast the statement about the "locked up" investor, not as a prediction about a future event, but as a statement about a current fact: "The district court's conclusion also avoids the inescapable logic that an investor either is 'locked-up' or not. If that investor did not buy, he or she never could have been honestly termed 'locked-up,' and the statement was false when made." This argument overlooks the fact that BEL may have honestly believed the investor was locked up when the statement was made. That the investor eventually did not materialize is not, by itself, enough to create an inference that the statement was false when made; other evidence is required to show that BEL did not believe, or lacked reason to believe, that the investor was locked up at the time it made the statement. Fraud is not shown simply because an expected occurrence did not occur. Vandeputte, 216 N.W.2d at 147; see also Berryman, 175 N.W.2d at 442.
 
 B. Fraudulent Concealment
 
 29
 Exeter next argues that the district court erroneously granted summary judgment against it on its fraudulent concealment claim. This claim is based on four allegedly material facts, which Exeter argues BEL fraudulently concealed from it: (1) that it did not intend to use its nationwide network to place Exeter's stock; (2) that it did not have a "locked up" investor; (3) that it had recently undergone a corporate reorganization; and (4) that the stock from a similar public placement by BEL had dropped precipitously soon after the initial offering.
 
 
 30
 For a nondisclosure to amount to a fraud, a party must first be under a duty to disclose information to another party. Richfield Bank & Trust Co. v. Sjogren, 309 Minn. 362, 244 N.W.2d 648, 650 (1976). Under Minnesota law, such a duty can arise in one of the following three circumstances: (1) where a party has made a representation and must disclose more information to prevent the representation from being misleading; (2) where a party has special knowledge of material facts to which the other party does not have access; and (3) where a party stands in a confidential or fiduciary relation to the other party. Id. Once such a duty is established, concealment is fraudulent if: "a party conceals a fact material to the transaction, and peculiarly within his knowledge, knowing that the other party acts on the presumption that no such fact exists...." Thomas v. Murphy, 87 Minn. 358, 91 N.W. 1097, 1098 (1902).
 
 
 31
 Exeter argues first that the district court erred in concluding that no fiduciary duty (and therefore no duty to disclose) existed between Exeter and BEL. Even if no fiduciary duty existed, Exeter contends, a duty to disclose arose under the two other theories: (1) that BEL's representations were misleading and thus imposed a duty to clarify; and (2) that BEL had special knowledge of material facts unavailable to Exeter. Exeter then argues that the district court erred in holding that, even if there was a duty to disclose, each of Exeter's four alleged concealments was insufficient to support a claim for fraud.[8]
 
 1. Nationwide Network
 
 32
 Exeter argues first that BEL fraudulently concealed the fact that it had no intention of using the nationwide network to market Exeter's stock. Citing the same evidence it relies upon in its fraudulent misrepresentation claim, Exeter argues that Stolpestad and Rance repeatedly told BEL that they were interested in an experienced brokerage house with a network of offices and a number of brokers. BEL employees replied that they could get the job done, referring to their nationwide network and handing them promotional materials that indicated the availability of that nationwide network. Having given the impression that the network would be utilized, Exeter contends, BEL committed fraud when it failed to tell Exeter that the nationwide network was not going to be used.
 
 
 33
 However, as noted above, Exeter has provided no evidence that BEL, at the time the statements were made or at any other time prior to August of 1990, had decided that it was not going to use the network. It was not until August 1990 that BEL formulated its marketing strategy and concluded that most of the sales would be made out of the Minneapolis office. BEL could not have been expected to disclose an intention that it had not yet arrived at. Cf. Lack Indus., Inc. v. Ralston Purina Co., 327 F.2d 266, 278 (8th Cir.1964). Moreover, even after August 1990, there is no evidence that BEL concealed from Exeter the fact that it was primarily using the Minneapolis office to market Exeter stock. Nor is there any evidence that the offices outside Minneapolis had been ruled out completely prior to October of 1990, when BEL refused Exeter's request to use the other offices. As Exeter has offered no evidence that BEL concealed anything, BEL was entitled to summary judgment on this claim.
 
 2. Locked Up Preferred Investor
 
 34
 Exeter also argues that BEL fraudulently failed to disclose the fact that it did not have a preferred investor "locked up." Again, as in its fraudulent misrepresentation claim, Exeter argues that the existence of a locked up preferred investor was material to its decision in April of 1990 to convert the private placement into a public offering. Yet, according to Exeter, BEL did not inform Exeter that there was no such investor until sometime in April or May of 1990, after it had decided to proceed with the public offering. Exeter further argues that the district court erred in holding that the absence of the locked-up investor was not a material fact. Although Exeter nevertheless went ahead with the public offering and signed the August 1990 agreement even after it knew that there was no locked up investor, Exeter argues that the decision to proceed had already been made, and it could not have been expected to pull out at so late a stage in the proceedings.
 
 
 35
 This contention is without merit. Exeter has failed to produce any evidence that BEL concealed the fact that it did not have a locked up investor. Exeter has presented no evidence that BEL knew that there was no locked up investor prior to Exeter's decision to engage BEL in March, prior to its decision to convert the offering from a private to a public one in April, or prior to telling Exeter in April or May of 1990 that no investor was locked up. BEL may, for all that appears, have informed Exeter of the lack of a locked up investor as soon as it found out that the investor was no longer locked up. Exeter has presented no evidence to suggest otherwise. Again, BEL could not have been expected to disclose information that it did not possess. As there is no evidence that Exeter concealed anything, the district court correctly entered judgment for BEL on this claim.[9]
 
 3. Corporate Reorganization
 
 36
 Exeter argues that BEL fraudulently concealed from it the fact that, during the offering, BEL was undergoing a corporate reorganization. Exeter contends that the reorganization resulted in uncertainty, turmoil, low morale, and disruption of BEL's business activities. This, in turn, affected the offering's chances of success. Exeter contends that the reorganization was material, since it could have affected the sale of its stock and Exeter's decision to retain BEL in the first place.
 
 
 37
 The district court correctly determined that the reorganization was not a material fact that BEL was under any duty to disclose.
 
 
 38
 Material facts are those that naturally affect the conduct of the party addressed. Typically, material facts are facts concerning the contract's subject matter or the parties' abilities to perform. Only these types of facts, which lie at the heart of the contract, can be said to naturally affect a party's conduct.
 
 
 39
 Lakeland Tool & Eng'g v. Thermo-Serv, 916 F.2d 476, 479 (8th Cir.1990) (citations omitted). Here, Exeter has presented no evidence that BEL's reorganization in any way affected the subject matter of the contract or BEL's ability to perform.[10] Although BEL did reduce staff in other departments during 1990, there is no dispute that it did not reduce the number of investment bankers during that period. In fact, the decision to reorganize the corporate finance department was not made until December 1990 and was not implemented until January 1991, long after Exeter had terminated its agreement with BEL. Exeter has presented no evidence that BEL's reorganization was material to the sale of its stock in any way. Accordingly, the district court correctly granted summary judgment on this claim. See Lakeland, 916 F.2d at 480 ("It is insufficient for [plaintiff] to merely contend that these facts were important to it; materiality is governed by an objective standard, and the existence of a duty to disclose is a question of law.").
 
 4. Prior Public Placement
 
 40
 Finally, Exeter argues that BEL concealed from it the fact that the price for a similar BEL stock-offering for First Federal Bank had declined precipitously after the initial offer. Exeter argues that a jury could reasonably find that such information was material to Exeter's decision to hire BEL. Moreover, Exeter argues that the district court erred in finding no evidence of concealment. Even though the stock price of the other offering was publicly available information, Exeter contends that it did not know the name of the company and therefore could not have looked up the information. Exeter accordingly argues that the district court erred in dismissing this claim.
 
 
 41
 We agree with the district court that this information could not be deemed material. The price of another, unrelated company's stock offering is not the type of information that lies at the heart of a contract to underwrite securities and that the underwriter has a duty to disclose. See Lakeland, 916 F.2d at 479-80. Exeter has cited no cases finding a duty to disclose such information. Indeed, Rance himself testified that he was not sure that he would have refused to proceed with the public offering had he known about the First Federal offering. In addition, Exeter has failed to provide any evidence of concealment. "Where information is not within the special knowledge of the defendant, there can be no concealment." Carlock v. Pillsbury Co., 719 F.Supp. 791, 842 (D.Minn.1989). The information about the stock price was publicly available in any newspaper. Exeter has not provided any evidence that the identity of First Federal and the fact that Exeter conducted the underwriting were facts within the special knowledge of BEL. Accordingly, the district court properly granted judgment on this claim.
 
 C. Professional Malpractice
 
 42
 Exeter argues that the district court erred in holding that no professional duty of care existed between BEL and Exeter and that all rights and duties between them were defined by the contract. Exeter argues that contractual and professional duties are not necessarily mutually exclusive under Minnesota law. Exeter concedes that no Minnesota cases have imposed a professional duty upon investment bankers, but draws an analogy to cases imposing a duty of reasonable care on accountants, lawyers, doctors, real estate agents, and other professional people engaged in furnishing skilled services for compensation. See, e.g., Vernon J. Rockler & Co. v. Glickman, Isenberg, Lurie & Co., 273 N.W.2d 647, 650 (Minn.1978). Exeter asks this court to extend such duties to cover investment bankers. Exeter argues that BEL breached such a duty in this case by failing to open the offering up to its other offices.
 
 
 43
 Even assuming, without deciding, that Minnesota recognizes a claim of professional malpractice against an investment banker, Exeter has failed to present evidence sufficient to survive BEL's motion for summary judgment. To prevail on a claim of professional malpractice, a plaintiff must show that the defendant failed to exercise the degree of care normally exercised by others in that profession in good standing under similar circumstances. City of Eveleth v. Ruble, 302 Minn. 249, 225 N.W.2d 521, 524 (1974). In this case, Exeter engaged BEL as its "exclusive financial advisor" to assist in its attempt to raise capital. Thus, assuming that an investment bank acting in such a capacity renders a professional service, Exeter was required to present evidence of the prevailing standard of care exercised by an investment bank in such a capacity, along with evidence of BEL's variance from that standard.
 
 
 44
 This Exeter has failed to do. Exeter argues that BEL's strategy for marketing the stock, in relying primarily on the Minneapolis office and in offering the stock primarily to local investors, fell below the professional standards normally exercised by investment bankers in similar situations. In effect, Exeter argues that BEL had a legal (not contractual) duty, arising out of its relationship as Exeter's financial advisor, to market the stock from its other offices. In support, Exeter offers the testimony of its expert, Michael Bochert, who testified that, in his opinion, BEL's approach did not provide sufficient sales power to ensure placement of all of Exeter's stock, and that the approach was therefore inappropriate. A simple difference in opinion as to what strategy would be the best way to have met a particular problem, however, is not sufficient to sustain a claim for professional malpractice.[11] Rather, Exeter was required to present evidence that, in focusing on local investors, BEL's actions were unreasonable and fell below the professional standards normally exercised by investment bankers faced with the same type of stock placement and in the same relationship to their client. Wartnick v. Moss & Barnett, 490 N.W.2d 108, 115 (Minn.1992). As Exeter has provided no such evidence, BEL was entitled to summary judgment on this claim.
 
 D. BEL's Counterclaim For Fees
 
 45
 Finally, Exeter argues that the district court, after finding that BEL had not breached the contract, erred in granting summary judgment to BEL on its counterclaim for expenses under the contract. Below, Exeter's only defense to BEL's counterclaim was that BEL had breached the contract. On appeal, Exeter now argues for the first time, and in the most cursory fashion, that the contract was void ab initio, since Exeter was induced to enter into it by the fraudulent representations alleged above.
 
 
 46
 The district court did not err. The contract clearly provided that Exeter would pay certain expenses incurred by BEL.[12] As the district court held that there was no breach, Exeter was obliged to pay these expenses. Exeter, moreover, has not appealed from the district court's judgment against it on the breach of contract claim, thus effectively conceding that there was no breach. Its only defense below is no longer available to it on appeal. Exeter now argues that the contract was void for fraud, but this argument was waived as it was not raised below. See Karl's Inc. v. Sunrise Computers, Inc., 901 F.2d 657, 659 (8th Cir.1990). Although Exeter argued generally below that BEL had made fraudulent misrepresentations, it never presented the void-for-fraud argument as a defense to the counterclaim, and the district court never received the opportunity to address it. In any event, we have found supra no evidence of fraud.
 
 III.
 
 47
 For the reasons stated above, we hold that the district court correctly granted summary judgment for BEL on all counts. The judgment of the district court is affirmed.
 
 
 
 *
 The HONORABLE LEVIN H. CAMPBELL, Senior United States Circuit Judge for the First Circuit, sitting by designation
 
 
 [1]
 Exeter originally brought suit in Minnesota state court; BEL subsequently removed the case to federal district court
 
 
 [2]
 The Honorable Diana E. Murphy, U.S. District Court for the District of Minnesota
 
 
 [3]
 Many of these assertions fail completely to identify who made the statement or when or in what context, instead attributing the statements to a nameless "they":
 "It was represented to us that they were going to use their other offices...."; "We were told they were the largest in the Midwest...."; "They warranted that they ... were going to sell through 70 offices, and give us all of this stuff about how strong they were"; "They had told us they were going to sell it through their large network."
 
 
 [4]
 William Feeley, director of capital markets: agreeing with counsel's statement that "the only practical interest in Exeter stock ... was going to be from people in Minnesota." David Downen, executive vice president: "I remember in this circumstance saying that we would not use our network to sell the stock. It was not that type of offering.... I talked about how difficult it is to raise equity for a situation like this. That it has to come primarily from local sources and people that know the principals in the deal."
 
 
 [5]
 Exeter also points to testimony from BEL employee Jay Walters, in which he stated that, as far as he knew, BEL never contemplated that Exeter stock would be sold from offices other than the Minneapolis office. However, the part of the record cited by Exeter is the transcript of a hearing before the district court, at which Exeter's counsel read from a deposition. The deposition was not made a part of the written record below and is not part of the record on appeal. Accordingly, we will not consider the statement by Walters. "[S]tatements of counsel are not evidence" and do not create issues of fact. United States v. Fetlow, 21 F.3d 243, 248 (8th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 456, 130 L.Ed.2d 365 (1994). In any event, we agree with the district court that statement adds little to Exeter's argument
 
 
 [6]
 Indeed, there is some doubt whether the testimony of Downen and Walters may be considered now on appeal, as Exeter failed to cite this testimony in support of its motion below. See Guarino v. Brookfield Township Trustees, 980 F.2d 399, 404-06 (6th Cir.1992). However, as we note above, even if considered, the testimony fails to raise a genuine issue of fact
 
 
 [7]
 In an attempt to get around this lack of evidence of intent, Exeter cites Florenzano v. Olson, 387 N.W.2d 168, 176 (Minn.1986), which states that a statement can be fraudulent if made positively and without qualification, and if the speaker is either conscious of his or her ignorance of the truth or realizes that the information upon which he or she relies is not adequate to support such an assertion. See also Clements Auto Co. v. Service Bureau Corp., 444 F.2d 169, 176 (8th Cir.1971). This does not help Exeter, however, since even under this standard, Exeter has failed to present any evidence that Bruss was either conscious of any ignorance of the truth or that he realized that he did not have adequate information to make his alleged assurance that the network would be used. Nor has Exeter submitted any evidence suggesting that Bruss's assertions amounted to a positive, unqualified statement that they would use the entire nationwide network
 
 
 [8]
 Because BEL does not, on appeal, fully develop its argument that there is no duty to disclose, we choose instead to resolve the issue by looking at the claims themselves, as we find in any event no merit to Exeter's claims
 
 
 [9]
 Moreover, we agree with the district court's conclusion that the absence of the locked up investor could not have been material. Stolpestad testified that he knew as early as April of 1990 that there was no locked up preferred investor. Yet Exeter nevertheless agreed sometime in April to go ahead with the public placement, and executed the letter of agreement several months later in August. Stolpestad also conceded that Exeter could have backed out of the deal at any time, but decided not to. Rance testified: "nobody held a gun to our head." It is undisputed that, by the time they signed the letter agreement in August 1990 to proceed with the public offering, Exeter knew that there was no locked up preferred investor. Thus, any earlier failure to disclose the lack of a locked-up preferred investor could not have been material to Exeter's decision to proceed with the offering
 
 
 [10]
 Although Exeter points to a portion of the deposition testimony of BEL employee Todd Nedberg, this portion says nothing about the impact of the reorganization. Exeter also points to a statement made by its counsel during a hearing before the district court, in which counsel paraphrases testimony allegedly given by Nedberg in a deposition. However, the portions of the deposition to which Exeter now refers do not support counsel's account. As we noted above, statements of counsel are not evidence
 
 
 [11]
 The deposition testimony of Todd Nedberg, to which Exeter also points, fails for the same reason
 
 
 [12]
 The August agreement provided:
 
 
 [10]
 Exeter will bear the expenses of the proposed offering customarily borne by issuers including the SEC, the "Blue Sky" and the NASD filing and registration fees, the fees of the accountants of Exeter, transfer agent and registrar fees, fees of counsel for Exeter, printing expenses associated with the offering, and underwriters' discounts and commissions
 
 
 [11]
 Exeter agrees to reimburse [BEL's] legal expenses incurred in connection with the offering up to a maximum of $35,000. In addition, without consideration of any legal fees paid, Exeter agrees to reimburse [BEL] for reasonable out-of-pocket expenses, including travel, lodging, meals and mailing costs. These fees and expenses will be paid whether or not the transaction contemplated by this letter is completed