# VILLAGE OF WELLS AND ANOTHER v. LAYNE-MINNESOTA COMPANY AND ANOTHER.[1]

July 31, 1953.

Nos. 35,876, 36,071.

[1]Reported in 60 N. W. (2d) 621.

*Frank Janes, Elliott O. Boe,* and *Richards, Janes, Hoke, Montgomery & Cobb,* for appellant Layne-Minnesota Company.

*Fowler, Youngquist, Furber, Taney & Johnson,* for appellant New York Casualty Company.

*Don M. Smith, L. Glenn Fassett,* and *Charles C. Luetke,* for respondent.

DELL, CHIEF JUSTICE.

The matter before us is a consolidation of two appeals arising out of an action for rescission of a contract and recovery of the consideration paid under it. Plaintiff Village of Wells, Minnesota, hereinafter referred to as the village, engaged defendant Layne-Minnesota Company, hereinafter referred to as Layne, to construct a municipal well. The defendant New York Casualty Company, hereinafter referred to as the surety, executed the performance bond to the village as surety for Layne. Upon completion of the well the village paid Layne $15,231, the contract price of the well. Thereafter the village commenced action against Layne and the surety to rescind the contract and to recover the $15,231 which it had paid, basing its right to rescission upon breach of contract. The action was tried by the court and resulted in findings and the entry of judgment rescinding the contract and awarding the village the sum of $18,069.74 against both Layne and the surety. This sum

represents the total amount paid under the contract by the village together with interest and costs.

Both Layne and the surety appealed from the judgment. Thereafter the surety moved the trial court for a reduction *nunc pro tunc* of the judgment entered against it to $8,820 plus interest on that sum and costs, claiming that that sum was the maximum amount for which it was liable, if at all, under its performance bond. The court dismissed the motion for lack of jurisdiction, the jurisdiction of the action having been previously vested in this court through the appeal from the judgment. Upon motion to this court the action was remanded to the lower court to enable the surety to renew its motion in that court for a reduction in the amount of the judgment rendered against it. The order of this court remanding the action provided that, should any party aggrieved by the order of the trial court upon the motion to be made by the surety appeal therefrom, such appeal should be consolidated with and heard upon the appeal from the judgment. Upon renewal of the motion by the surety, it was denied, and the surety appealed from the order.

The appeal from the judgment, when simplified, presents this question: Under the facts disclosed by the record was this a proper case for rescission? The appeal from the order denying a reduction in the judgment rendered against the surety presents this question: Was the trial court authorized to enter an order *nunc pro tunc* for the reduction of the judgment, and if the court was so authorized, did the surety establish, on the merits, its right to such relief?

In September 1948, Layne entered into a written contract with the village wherein Layne agreed to construct a municipal well capable of producing a minimum of 500 gallons of water per minute. The pertinent provisions of the contract[2] and specifications[3] are in the footnotes.

[2]"The Contractor also covenants and agrees that all said work and labor shall be done and performed in the best and most workmanlike manner and that all such materials and labor shall be in strict and entire conformity, in every respect, with the said specifications and shall be subject to the inspection and approval of the Engineers or duly authorized repre-

The contract and specifications anticipated a well approximately 350 feet deep. However, pumping tests were conducted when the well was completed to that depth and, while they indicated that the well would meet the minimum gallons of water per minute, they disclosed that it would not produce sand-free water. The village, through its engineer and pursuant to a clause in the contract, ordered drilling operations to continue. Ultimately the well was completed at a depth of 670 feet. A second pumping test was then run using Layne's test pump at a setting of 230 feet. The village was satisfied with the second test. Neither the village nor its engineer expressed any dissatisfaction with the construction of the well or its capacity. Layne rendered a statement to the village for the full contract price of the well of $15,231, which price was determined on a unit basis, and it was paid.

After the well was completed and paid for, the village, pursuant to bids, purchased a Fairbanks-Morse turbine pump. Keith Brown, a private contractor, was engaged by the Fairbanks-Morse Company to install the pump. He experienced little difficulty in lowering the pump to a depth of 200 feet, and at that level the pump was able to continuously produce 300 gallons of water per minute. Brown was instructed by the village engineer to lower the setting to the 250-foot level in an effort to increase the output. When Brown attempted to make this setting, he encountered difficulty at about the 240-foot level. He decided, after trying to "shake it in," that the pump would go no lower. He then shortened the shaft and made a setting at the 230-foot level. At that level the pump

sentatives, and in case any of said materials or labor shall be rejected by the said Engineers as defective or unsuitable then the said materials shall be removed and replaced with other approved materials and said labor shall be done anew to the satisfaction and approval of said Engineers."

[3]"The well shall be sunk straight, round and plumb so that the bowls of a turbine pump, of the largest size commonly made for use in a well of this diameter, may be freely inserted with its shaft straight and vertical to such a depth that will cause the highest bowls to be submerged even if the well were pumped at a rate that would cause a 50% drawdown of the depth of water in the completed well."

produced "Not quite 400. About 375 or 380 gallons" per minute. He then pulled the pump and ran plumb-bob tests in an effort to ascertain the difficulty. A similar test was also conducted by Reynold Hagglund, an engineer employed by the village. The village contends that these tests established that the well was neither plumb nor in proper alignment and demonstrate the reason that the pump's column and shaft could not be inserted below the 240-foot level.

Correspondence followed between the engineer for the village and Layne concerning the difficulty encountered by Brown in attempting to set the pump. Layne then conducted a plumbness and alignment test, which consisted of lowering a 40-foot length of 7-inch pipe with four 9½-inch couplings and with a standard 8-inch by 4-inch "swage nipple" to the bottom of the well. Layne contended that this test established that the well complied with the contract and specifications. The village then brought this action in rescission and to recover the $15,231 which it had paid.

It is the claim of the village that the well fails so utterly to comply with the contract and specifications that rescission is a proper remedy. The static water level is 137 feet below the surface. Therefore, to comply with the specifications it must be possible to freely insert the bowls of the pump in the well to a depth of 403 feet. The village asserts that no installation can be effected below the 240-foot level because the well is crooked and malaligned. Layne maintains that this is not true and that the well meets the contract and specifications. While it concedes that the well is not perfectly straight and plumb, it contends that the specifications only require that it be sufficiently straight, round, and plumb for the bowls of the turbine pump to be freely inserted with its shaft straight and vertical to such a depth as would cause the highest bowls to be submerged even though the well were pumped at a rate that would cause a 50 percent drawdown of the depth of water in the completed well. Layne introduced opinion evidence of experts in the field of well drilling that it is not possible to drill a perfectly straight, round, and plumb well with drilling equipment currently

in use. It claims to have established that the well is sufficiently straight, round, and plumb to comply with the contract and specifications by testimony to the effect that: (a) The drilling cable did not fray as would be normal if the well was crooked or had a high degree of drift; (b) a 12-inch pipe, 365 feet in length consisting of welded sections was lowered into the well without mishap; (c) 240 feet of the 12-inch pipe was removed from the well without mishap; (d) a 40-foot dummy consisting of welded sections of 7-inch pipe was lowered to the bottom of the well. It further claims that the plumb-bob tests made by the village are not reliable and are no longer considered authentic in testing for plumbness and alignment of wells.

Layne claims that Brown was unable to install the Fairbanks-Morse pump to the desired depth only because the pump bowls were not equipped with proper guides necessary to enable the pump to pass an overlap or ledge in the well at the 240-foot level. The inside diameter of the well is not uniform. A 16-inch casing extends to a depth of 262 feet; a 12-inch casing extends downward from the 240-foot level. The space between the 12-inch and 16-inch casings was filled with concrete to make a waterproof joint. Thus the 16-inch and 12-inch casings are separated by a ring of concrete 2 inches wide which creates a ledge or overlap at the 240-foot level. This type of construction was necessary and agreed to by Layne, the village, and its engineer because it was necessary to seal off the trouble-producing St. Peter sandstone at the 350-foot level. Layne maintains that, if a setting is attempted without the use of guides, the base of the pump bowls, which is $9\frac{1}{2}$ inches in diameter, will invariably come to rest on a portion of the ledge of cement at the 240-foot level and will not pass through the 12-inch casing.

Although the evidence indicates that a number of wells have an overlap caused by a reduction in their diameter, expert witnesses on both sides agreed that few of these wells have pump settings below the overlap. Brown, who attempted to install the pump, had no prior experience in setting a pump below an overlap. Moreover, he was not advised nor did he know that there was a ledge or over-

lap at the 240-foot level until after he had unsuccessfully attempted to install the pump. In spite of this fact he made no attempt at installation after being advised of this condition, it being his opinion that, if he was able to install the pump below the overlap, the pump shaft would be bent and that this would cause mechanical difficulties which would shorten the life of the pump.

Rescission is an equitable remedy which may be granted for a substantial breach of contract.[4] It is the general rule that a party seeking rescission must as a condition precedent return or offer to return that which he has received under the contract in order to restore the parties to the positions which they occupied prior to the transaction. "After one party to a contract has performed a substantial part of the same, unless he can be placed in statu quo, the other party cannot rescind for his default in further performance, but is limited to an action for damages for such breach of the contract."[5] This rule, however, is not inflexible and yields whenever under the circumstances restitution is not essential to the complete administration of justice between the parties.[6]

In the Darelius case this court stated (152 Minn. 134, 188 N. W. 211):

"* * * It is stated as a general rule that a court will not grant rescission without placing the parties in the situation they were in when the transaction was done. * * * But this rule is not invariable. It is founded on the principle that 'he who seeks equity

---

[4]United Cigar Stores Co. v. Hollister, 185 Minn. 534, 242 N. W. 3; The Staring Co. v. Rossman, 132 Minn. 209, 156 N. W. 120; Karbach v. Grant, 131 Minn. 269, 154 N. W. 1071; Julius Kessler & Co. v. Parelius, 107 Minn. 224, 119 N. W. 1069; Schultz v. Spicer, 154 Minn. 271, 191 N. W. 423; 3 Dunnell, Dig. (3 ed.) § 1186; 4 Id. §§ 1808, 1809; 17 C. J. S., Contracts, § 422.

[5]Hunter v. Holmes, 60 Minn. 496, 498, 62 N. W. 1131, 1132; 4 Dunnell, Dig. (3 ed.) § 1808; 3 Id. § 1185; see, also, 3 Black, Rescission and Cancellation (2 ed.) § 618; 5 Williston, Contracts (Rev. ed.) § 1460; Beattie v. Friddle, 229 Ky. 361, 17 S. W. (2d) 246; Laramie Poudre Irr. Co. v. Redfeather Lakes Resort, Inc. 94 Colo. 479, 31 P. (2d) 917.

[6]Darelius v. Commonwealth Mortgage Co. 152 Minn. 128, 188 N. W. 208; 17 C. J. S., Contracts, § 438.

must do equity,' and, whenever under the circumstances of the particular case restitution by plaintiff is not essential to the complete administration of justice between the parties, it will not be required. The rule goes no farther than justice requires."

It is not necessary to return property which is utterly worthless.[7]

Since a well is involved here, it is obvious that restitution is a physical impossibility. That being true, is restitution by the village unnecessary to the complete administration of justice between the parties? To allow rescission would leave the village in possession of the well and Layne uncompensated for the work performed and the materials furnished in the construction of the well. The village, recognizing the general rule that the party seeking rescission must return or offer to return that which it has received under the contract as a condition precedent to rescission, contends that the rule creates no obstacle here and that rescission is a proper remedy because the well has no value and is worthless to the village. The trial court found that "the well was worthless and of no value whatsoever to the plaintiff." With this finding we are unable to agree. The evidence of the witnesses produced by the village establishes that, even if it is impossible to lower the pump beyond the 240-foot level, the well is capable of continuously producing "Not quite 400. About 375 or 380 gallons" per minute or approximately 75 percent of the capacity of the well contracted for by the village. There is expert testimony that it is reasonable to anticipate that the capacity of the well may be increased by blasting at its base. Vernon C. Lundquist, the engineer who designed and supervised the construction of the well for the village and who appeared as its witness, testified in cross-examination:

"Q. And, as an engineer, can you tell us, in your opinion, as to whether there are other rather simple cures that might change this

---

[7]Darelius v. Commonwealth Mortgage Co. 152 Minn. 128, 188 N. W. 208. For decisions from other jurisdictions, see 17 C. J. S., Contracts, § 439; 1 Black, Rescission and Cancellation (2 ed.) § 200.

particular well so as to produce 500 gallons a minute, without substantial expenditure?

"A. There may be."

The record also contains reliable evidence, concerning which there appears to be no substantial dispute, that a submersible type of turbine pump can be installed to the desired depth even if the well is as crooked and malaligned as the village claims and that such pump, when so installed, will be capable of continuously producing approximately 750 gallons per minute. Keith Brown, one of the expert witnesses of the village, admitted that the well had an intrinsic value. Howard E. Barton, superintendent of the Wells Public Utilities Commission and a witness for the village, testified that the well produced 350 gallons per minute; that the village needed a stand-by well; that its present stand-by well, which produced 300 gallons per minute, was in need of repairs; and that unless repairs were made it might break down entirely. G. H. Ellig, a member of the Wells Public Utilities Commission, admitted that, if the well would produce 380 gallons per minute as the evidence of the village established, it would have value to the village. Under the evidence of plaintiff's own witnesses it cannot be said that the well is worthless and of no value to the village. This is not a case where it can be said that restitution is not essential to the complete administration of justice between the parties.

■ We further conclude that the village is estopped by its conduct from resorting to the remedy of rescission. The well was constructed under the supervision of the engineer employed by the village. He was given the right not only to inspect the well during its construction but to order the work done "anew" if not satisfactory. When the well was completed to the 350-foot level, tests conducted with the approval of the engineer established that sand-free water could not be obtained. Other than that, Layne was led to believe that the well apparently was satisfactory for no complaints were made. Exercising its right under the contract, the village, through its engineer, ordered drilling to continue knowing that 12-inch casing would have to be inserted within the 16-inch casing and the

ledge or overlap created at the 240-foot level. The village now contends that the difficulty with the well is in the original 350 feet which was constructed at a cost of $8,820. It contends that by merely looking down into the well 137 feet to the level of the water with a flashlight or using the sun's rays reflected in a mirror it is plainly evident that the well has an extreme amount of drift and that at about the 80- or 90-foot level there is a bulge known in well-drilling parlance as a "dog leg." It contends that such casual inspection shows that the well does not comply with the contract and specifications and shows that it is not sufficiently straight, round, and plumb to permit the bowls of a turbine pump to be inserted as provided for by the contract. Notwithstanding what it now claims a casual inspection will disclose the village and its engineers required Layne, under the contract, to continue drilling an additional 320 feet and to insert the necessary casing to complete the well at an additional cost under the unit prices contained in the contract of $6,411. By remaining silent and failing to reject the well when it was at the 350-foot level and by instructing Layne to continue with the drilling it is in no position now to invoke the equitable doctrine of rescission.

Equitable estoppel arises from the conduct of a party. It includes his spoken or written words, his positive acts, and his silence or negative omission to do anything. Its foundation is justice. Its object is to prevent the inequitable assertion or enforcement of claims or rights which might have existed or have been enforceable by other rules of law unless prevented by the estoppel. Its practical effect is, from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel. It may arise where a party remains silent when it is his duty to speak or in failing to assert a right and knowingly permitting another to act to his prejudice when the assertion of the right would have avoided the loss.[8]

[8]Dimond v. Manheim, 61 Minn. 178, 63 N. W. 495; Macomber v. Kinney, 114 Minn. 146, 128 N. W. 1001, 130 N. W. 851; Nell v. Dayton, 43 Minn. 242, 45 N. W. 229; St. Denis v. Mullen, 157 Minn. 266, 196 N. W. 258; In re

We conclude that the village is limited to an action for damages for breach of contract.[9] In such an action it can receive full redress. It is entitled to a well which complies with the contract and specifications. If, upon the trial of such an action it is found that Layne has breached its contract, whatever damages the village has sustained can and should be recovered. The judgment must be reversed but without prejudice to the institution and maintenance of an action upon all issues by the village to recover damages against Layne for breach of contract.

Upon the oral argument before this court, Layne offered to install the Fairbanks-Morse pump and to produce the required capacity of the well under the contract. It would seem that some thought might well be given to this offer, assuming that the work could be done without expense to the village.

■ The reversal of the judgment makes it unnecessary to pass upon the appeal of the surety from the order denying its motion to reduce the judgment. The judgment having been set aside, there is nothing to reduce. In the event of future litigation the question may not arise. It is appropriate, however, to state that on the record here the admission made by Mr. Frank Janes during the course of the trial seems proper. However, until such time as the issue comes before us again in future litigation between the parties, we purposely refrain from deciding it.

Reversed.

MR. JUSTICE NELSON, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.

Estate of Peterson, 203 Minn. 337, 281 N. W. 275; 6 Dunnell, Dig. (3 ed.) §§ 3186, 3187.

[9]Hunter v. Holmes, 60 Minn. 496, 62 N. W. 1131; 4 Dunnell, Dig. (3 ed.) § 1808.