**TRANSAMERICA INSURANCE GROUP, Respondent,**

v.

**Walter J. PAUL, Appellant.**

**No. 48061.**

Supreme Court of Minnesota.

June 9, 1978.

Dickel, Johannson, Wall & Taylor, Kenneth F. Johannson, Crookston, for appellant.

Cahill, Gunhus, Streed, Grinnell, Jeffries & Klinger, Moorhead, for respondent.

Heard before TODD, YETKA, and SCOTT, JJ., and considered and decided by the court en banc.

TODD, Justice.

Appellant, Walter J. Paul, made application to the Transamerica Insurance Group (Transamerica) and was issued a wholesale produce dealer's performance bond, representing that he was the owner of a small cheese company. In fact, Paul's son-in-law was the company's owner-operator. The company subsequently became insolvent, and the surety was forced to pay the entire face value of the bond toward suppliers' claims against the cheese company. The surety filed this action against Paul for indemnification. The district court held that Paul was estopped from denying his ownership of the cheese company. We affirm.

Paul is a retired farmer who resides near Beltrami, Minnesota. During the summer of 1973, Paul's son-in-law undertook to equip and operate a small cheese factory. Paul assisted his son-in-law's endeavor with financial help and the lease of a truck to the new business. Since cheese processing requires the purchase of substantial quantities of raw milk, the business fell within the definition of "wholesale produce dealer" under Minn.St. 27.01, subd. 8. Minnesota law requires that all such dealers be licensed by the commissioner of agriculture and bonded by a commercial surety company. Minn.St. 27.03 and 27.041.

For a reason which does not appear in the record, Paul's son-in-law was unable to procure the required license and bond in his own name. He therefore prepared and submitted the appropriate applications listing Paul as the owner of the new enterprise—the Winger Cheese Company (Winger). This was done with Paul's knowledge and consent. The license was approved by the commissioner of agriculture effective October 1, 1973. The commissioner set the amount of the bond at $4,000, and Transamerica issued a performance bond in that amount, naming "Walter J. Paul, d/b/a Winger Cheese Company" as principal.

Shortly thereafter, Winger commenced operation. It is undisputed that Paul played no role in the day-to-day operation of the company. These duties were handled solely by his son-in-law. Within 1 year the company encountered financial difficulties and filed a voluntary bankruptcy petition. Paul's son-in-law was subsequently declared bankrupt, and among the creditors who participated in the distribution of the bankrupt estate was Paul. Later, however, the trustee in bankruptcy changed his position and brought an action against Paul to have the latter declared a partner or part owner of the cheese business. The Federal district court dismissed the trustee's complaint and held that in spite of Paul's designation as licensee on both the license application and performance bond, he was not a partner in the Winger operation for bankruptcy purposes.

Meanwhile, Winger's creditors had taken action to enforce their claims against the performance bond under state law. The purpose of the bonding requirement is to protect the farmers who supply wholesale produce dealers with agricultural raw materials. Minn.St. 27.06 provides a mechanism whereby suppliers may collect against the performance bond of a defaulting produce dealer. The statute requires that such claims be filed with the commissioner of agriculture for investigation, and at the commissioner's discretion, a hearing may be ordered. Following its investigation, the commissioner's office is to issue an order determining the rights of the complainants. If this order is not complied with within 15 days, the parties have 30

additional days in which to bring an action against the surety.

In this case, a hearing for claims against the Winger bond was had on April 24, 1975, in Mahnomen, Minnesota. The hearing was conducted by a representative of the commissioner of agriculture. Paul received notice of the hearing by certified mail, but apparently chose not to attend. Although Paul was not represented at the hearing, his attorney did send a letter of protest to the commissioner's office prior to the hearing date. At the hearing, claims far in excess of the $4,000 bond were reviewed. Thereafter, the commissioner filed his findings and conclusions, allowing 101 claims totaling $113,672.94, and ordering Transamerica to pay the $4,000 face amount of the bond to the commissioner for pro rata distribution to eligible claimants.

A copy of the commissioner's order was sent to Paul by certified mail. Transamerica notified Paul of its intention to comply with the order and seek indemnification for the $4,000 from Paul. Counsel for Paul sent a reply letter to Transamerica in which he took the position that his client was not liable to Transamerica. The latter subsequently complied with the commissioner's order and brought this action against Paul in district court to recover the $4,000 paid under the bond. Both parties moved for summary judgment. The district court ruled that the representation of ownership made by Paul in his application for the performance bond estopped him from denying his liability to indemnify Transamerica.

The narrow issue on appeal is whether Paul may be held liable to indemnify Transamerica on the bond in which he is the named principal. In their efforts to resolve this question, however, the parties have devoted a substantial portion of their argument to matters which in our view are simply not relevant. Transamerica has suggested that the total amount of the claims allowed at the agriculture department hearing is res judicata with respect to Paul. In response, Paul argues that the hearing officer lacked the jurisdiction to fix any liability as between Transamerica and Paul.

Both positions miss the mark. The hearing has no direct effect on this case. The hearing officer simply ruled on the validity and amount of the claims presented to him. He had no authority to and did not address the question of Paul's liability for indemnification. That question is the only one before us; the amount of the claims allowed is not at issue. Thus, the claims hearing can have no res judicata effect on this litigation.

Paul also argues that the bankruptcy decision which held that he was not a part owner of Winger collaterally estops Transamerica from relitigating the issue of ownership. This contention is entirely without merit. It is elementary that the relitigation of a previously decided issue may be collaterally estopped only where (1) the party sought to be estopped (or his privy) was fully represented in the original litigation, and (2) resolution of the issue in question was a necessary component of the original decision. See, *Shimp v. Sederstrom*, 305 Minn. 267, 233 N.W.2d 292 (1975); *Sachs v. Jenista*, 296 Minn. 535, 210 N.W.2d 45 (1973); 10B Dunnell, Dig. (3 ed.) § 5162.

Neither of these conditions has been satisfied in the present case. Transamerica was never a party to the bankruptcy proceedings and in fact had no claim against Winger or Paul until sometime later. Similarly, the precise issue for determination in this case was not before the bankruptcy court. That court declined to characterize Paul as an owner of the cheese company. In the instant case, however, we are not at all concerned with the actual ownership of Winger. This case comes before the court on a theory of equitable estoppel, and the material issue is whether Paul should be deemed the owner of the company by virtue of his false representations to Transamerica. For practical purposes, Transamerica could concede that Paul was never the owner in fact of Winger. Thus, the issue litigated in the bankruptcy court is irrelevant to the disposition of this case and could not be asserted against Transamerica even if it were relevant.

We turn, then, to the determinative issue of this appeal. The district court ruled that because Paul had represented himself to Transamerica as the owner of the cheese factory, he was estopped to deny that fact as against Transamerica. In *In re Estate of Peterson,* 203 Minn. 337, 342, 281 N.W. 275, 278 (1938), we described the doctrine of equitable estoppel as follows:

" * * * Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of property, contract, or remedy. * * *

    *    *    *    *    *    *

"The doctrine of estoppel *in pais* is founded in justice and good conscience and is a favorite of the law. It arises when one by his acts or representations, or by his silence when he ought to speak, intentionally or through culpable negligence, induces another to believe certain facts to exist, and such other rightfully acts on the belief so induced in such manner that if the former is permitted to deny the existence of such facts it will prejudice the latter."

See, also, *Eliseuson v. Frayseth,* 290 Minn. 282, 187 N.W.2d 685 (1971); *Village of Wells v. Layne-Minnesota Co.,* 240 Minn. 132, 60 N.W.2d 621 (1953).

■ The doctrine of equitable estoppel may be asserted to bar a litigant from denying the truth of representations of fact previously made where the following requirements are met:

(1) There must be a misrepresentation of a material fact;

(2) The party to be estopped must be shown to have known that the representation was false;

(3) The party to be estopped must have intended that the representation be acted upon;

(4) The party asserting the estoppel must not have had knowledge of the true facts; and

(5) The party asserting the estoppel must have relied upon the misrepresentation to his detriment. 31 C.J.S., Estoppel, § 67. See, also, 6B Dunnell, Dig. (3 ed.) § 3187.

[4] On the record before us, these requirements have been satisfied. That is, at the time the bonding agreement was entered into with Transamerica, (1) Paul was not the owner of Winger; (2) Paul knew who the true owner was; (3) Paul undoubtedly intended that Transamerica issue a bond based on his application: (4) Transamerica had no reasonable means of knowing the true state of affairs; and (5) since Paul was the only person listed on the bonding agreement, Transamerica quite clearly relied on his representation of ownership.

Accordingly, we hold that the district court correctly invoked the doctrine of equitable estoppel against Paul. The district court's entry of summary judgment in favor of Transamerica is therefore affirmed.

Affirmed.