# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

No. 99-6064MN
No. 99-6065MN
No. 99-6067MN

_____

In re Digital Resource, LLC,              *
    Debtor.                              *
                                                                 *
----------------------------------------------   *
Digital Resource, LLC,                    *
    Plaintiff-appellee,                 *
                                *
Signal Bank National Association,         *
    Intervenor plaintiff,               *
                                *
            v.                              *
                                *
Abacor, Inc., a Minnesota corporation     *
formerly known as Alderbrook              *    Appeals from the United States
Technologies, Inc.; James A. Lostetter;   *    Bankruptcy Court for the
Randy J. Lostetter,                       *    District of Minnesota
    Defendants-appellants.              *
----------------------------------------------   *
Digital Resource, LLC,                    *
    Plaintiff-appellee,                 *
                                  *
Signal Bank National Association,         *
    Intervenor plaintiff,               *
                                *
            v.                              *
                                *
Christopher A. Grove; Severson, Sheldon,  *
Dougherty & Molenda, P.A.;                *
    Appellants,                         *
                                *
Abacor, Inc., a Minnesota corporation     *
formerly known as Alderbrook              *
Technologies, Inc.; James A. Lostetter;   *

Randy J. Lostetter,                                     *
     Defendants-appellants.                         *
-----------------------------------------------        *
Digital Resource, LLC,                                 *
     Plaintiff-appellant,                           *
                                                       *
Signal Bank National Association,                      *
     Intervenor plaintiff,                          *
                                                       *
            v.                          *
                                                       *
Abacor, Inc., a Minnesota corporation                  *
formerly known as Alderbrook                           *
Technologies, Inc.; James A. Lostetter;                *
Randy J. Lostetter,                                    *
     Defendants-appellees.                          *

_____

Submitted: January 26, 2000
Filed: March 31, 2000
_____

Before WILLIAM A. HILL, SCHERMER, and JACKWIG,[1] Bankruptcy Judges.
_____

WILLIAM A. HILL, Bankruptcy Judge.

James Lostetter, Randy Lostetter, and Abacor, Inc., appeal from the bankruptcy court's June 25, 1999 memorandum order concluding that they were liable to the debtor for fraud and breach of an asset purchase agreement involving the sale of their computer software business to the debtor. The defendants contend, inter alia, that they committed neither fraud nor breach of contract and that it was improper for the bankruptcy court to grant rescission of the asset purchase agreement. Digital Resource, LLC, cross-appeals from the bankruptcy court's August 5, 1999 memorandum order refusing to award attorney fees

_____

[1]The Honorable Lee M. Jackwig, United States Bankruptcy Judge for the Southern District of Iowa, sitting by special designation.

2

to the debtor and refusing to impose a constructive trust in this case. Finally, the defendants' attorney, Christopher A. Grove, and his law firm, Severson, Sheldon, Dougherty & Molenda, P. A., appeal from the imposition of sanctions against them for issuing a subpoena which the bankruptcy court found to be unduly burdensome on a non-party witness. We affirm in part and reverse in part, remanding the case for further consideration of the rescission remedy.

FACTS

This case concerns the negotiations for and eventual sale of a computer software business. James Lostetter and Randy Lostetter (collectively, the "sellers") ran Abacor, Inc. ("Abacor"), a closely held company in the business of selling computer software. James was chiefly responsible for Abacor's operations and owned most of its stock. Randy, James' son, was a minor shareholder and kept Abacor's books. In 1996, Randy moved to Belgium, and James decided to sell Abacor.

Timothy Nacey and Daryl Nelson (collectively, the "buyers") are the two principal shareholders of debtor Digital Resource, LLC, a company formed to purchase Abacor. Both men were experienced in middle-management, and Abacor was one of five businesses they investigated with the intention of buying. Nacey met James Lostetter through a mutual friend in early 1996. During several meetings before September of that year, Nacey expressed to James his goals in purchasing a business as follows: (1) he and Nelson should each be able to draw annual salaries of $100,000; (2) the business to be purchased should have a history of growth; and (3) the transition must be smooth. James was the principal contact with Nacey and Nelson during the negotiations involving the sale of Abacor.

As a small business, Abacor did not devote much of its efforts toward maintaining up-to-date financial records, and James was not able to supply Nacey and Nelson with financial statements for 1995 until September 1996. Between April and September 1996, James made the following representations to Nacey and Nelson about Abacor: (1) that the business earned approximately $3 million in gross yearly revenue; (2) revenue growth had been approximately 30 percent a year; (3) that the business enjoyed a solid rate of earnings; (4) that the business was current in its payables and receivables, with receivables running ahead of payables by at least $75,000 and leaving considerable margin for use of the difference to

3

meet operating expenses; and (5) that the business rarely had to write off bad debt.

In September 1996, James supplied Nacey and Nelson with a combined financial statement covering the years 1992, 1993, 1994, and 1995. The statement confirmed James' prior representations in that during this period, (1) annual revenues steadily increased from $1.4 million to $3.3 million; (2) operating income had steadily increased from $124,000 to $230,000; (3) shareholders equity had steadily increased from $274,000 to $497,000; (4) the business had virtually no debt; (5) receivables consistently advanced payables by a healthy margin; and (6) the business rarely took a charge for bad debt. Based on James' representations and the combined financial statement, Nacey prepared cash flow analyses demonstrating Nacey's reliance on these figures in deciding to go forward with purchasing Abacor. The purchase was to be highly leveraged through financing obtained from the sellers. Thus, the buyers anticipated that they would have to rely upon income generated by the business to pay operating costs and to pay down the purchase debt.

Between December 1996 and March 31, 1997, the buyers entered final negotiations to purchase Abacor, and towards that effort, they hired attorney Jeffrey Saunders to draft an asset purchase agreement. On January 10, 1997, Saunders wrote to the sellers' counsel, requesting financial documents for the completion of due diligence, including Abacor's financial statements for the years 1993 through 1996 and all work papers related thereto. However, the work papers showing that a large portion of Abacor's receivables were over 90 days old and older and that Abacor's financial performance had entered a dramatic tailspin for the last three quarters of 1996 were never provided to the buyers. Instead, in accordance with Abacor's calendar-year income tax method of accounting, James gave the buyers a financial statement for 1996 which showed that Abacor earned approximately $102,000 in net income. Significantly, the 1996 financial statement did not show that the entire $102,000 in net income for 1996 was actually attributable to the first quarter of that year or that Abacor had entered a financial tailspin during the last 3 quarters of 1996, resulting in a loss of approximately $37,000 in net income. The financial statement did show that annual sales were approximately $725,000 less than in 1995 and that net income was correspondingly down by approximately $120,000 from 1995 figures. However, James explained that the poor figures were due to a delay in the release of a product upon which Abacor depended for a large portion of its revenues. James assured the buyers that the 1996

4

figures were aberrational, that the drop in revenue was not part of a downward trend, that the first quarter of 1997 would be strong, and that Abacor was on track to do better in 1997 than in 1996. Due to the sellers' poor financial record-keeping and failure to keep current accurate financial information on hand, James had no direct knowledge as to the truth or falsity of the representations he made about Abacor's continuing good performance. The representations were essentially based on James' "gut feel" about Abacor's performance.

The sale was scheduled to close on March 31, 1997. During the period leading up to closing, James continued to orally represent to Nacey and Nelson that first quarter 1997 would be strong and that both receivables and payables were in good shape. Although the buyers and their attorney, Saunders, continued to request updated financial information for 1997, it was never provided. Accordingly, Saunders drafted the asset purchase agreement to include stringent representations and warranties by the sellers regarding the accuracy, completeness, and nonmisleading quality of the information that had been supplied to the buyers. The following provisions appeared in the asset purchase agreement:

> Seller represents and warrants, and acknowledges that, (i) notwithstanding any investigation Buyer may undertake, Buyer is relying on the following representations and (ii) except as otherwise specifically provided herein, the same shall be true on the date hereof and as of the Closing Date and shall survive the Closing of this transaction in accordance with Section 21 of the Agreement.
>
> 5.4  Financial Statements.  Buyer has received true, complete and accurate copies of the Financial Statements. The Financial Statements, including the notes thereto, have been prepared on the accounting basis used by Seller for income tax purposes, consistently applied throughout the periods indicated, and present fairly the financial condition of Seller as at the dates indicated and for the periods indicated in the Financial Statements.
>
> 5.6  No Material Change.  Except as set forth in Schedule 5.6 attached hereto or as contemplated in Article 7 hereof, since December 31, 1996 there has not been:
>
>> 5.6.1  any material adverse change in the business, financial condition, operations or results of operations of Seller or the Business;

5.27 <u>Material Omissions</u>.  No representation or warranty by Seller in this Agreement nor any statement, certificate, or schedule furnished to or to be furnished by Seller pursuant to this Agreement, or any document or certificate delivered to Buyer pursuant to this Agreement or in connection with the transactions contemplated herein contains or will contain any untrue statement of material fact or omits or will omit a material fact necessary to make the statements contained therein not misleading in light of the circumstances.

The buyers specifically declined the sellers' request that the above representations and warranties be qualified by language such as "to the best of Sellers' knowledge."  Moreover, the purchase agreement conspicuously fails to include standard language that acknowledges the buyers' reliance on its own investigation.  The purchase agreement also provided the following:

For purposes of this agreement, any reference to "the knowledge of," "the best knowledge of," "known," or other similar term of a party hereto, when modifying any representation, warranty, covenant or agreement made by Seller, shall mean that none of the officers, directors or senior management of Seller has any actual and present knowledge that such representation, warranty, covenant or agreement is not true and correct to the same extent as provided herein, after such person had made an appropriate review of all applicable files.

James and Randy both admitted that they did not conduct an appropriate review of the files before closing.

The asset purchase was closed on March 31, 1997.  The negotiated price was $1.2 million.  In addition, the buyers agreed to pay $300,000 in return for non-competition, confidentiality, and consultation agreements with the sellers.  Nacey and Nelson borrowed money against their retirement accounts to come up with $375,000 for the down payment.  Nacey and Nelson's company, Digital Resource, LLC, then executed a promissory note for $825,000 in favor of Abacor, payable over 10 years in monthly installments of $10,450.75.  The note was secured by essentially all of the assets purchased from Abacor, and Nacey and Nelson both personally guaranteed the $825,000 note.

6

Within a month after closing, the software business was in financial crisis. The December 31, 1996 financial statement listed accounts payable at $267,335, and in negotiations just prior to closing, James indicated that the business was reasonably current on all its payables. However, a significant portion of payables were over 75 days old, and the company's main vendor threatened cancellation unless Nacey and Nelson made an immediate $90,000 payment. In addition, a large portion of receivables were so aged as to be largely uncollectible. The December 31, 1996 financial statement showed accounts receivable amounting to $316,658, and James had represented before closing that the business had $335,000 in receivables. However, despite significant effort, Nacey and Nelson were only able to collect approximately $244,000. Finally, the business simply did not perform well. Contrary to James' representations regarding the company's continued good performance, the company had in fact entered a dramatic tailspin in the second quarter of 1996 from which it would ultimately never recover.

After taking over the business, the buyers discovered that the sellers had removed from the business site all of Abacor's historical financial documents. As a result, the buyers subsequently hired two accountants to attempt a reconstruction of the company's financial history in an attempt to discover the reason why the business was failing. The first accountant was fired after a confrontation with James where concerns were raised about the company's financial performance during the period just prior to its sale to the buyers. The second accountant also began to question whether the business had been profitable before it was sold but couldn't pinpoint the reason why the company was failing.

The buyers stopped making their monthly note payments after January 1998. On February 26, 1998, the sellers commenced a replevin action in Hennepin County District Court for the State of Minnesota. Digital Resource filed its bankruptcy petition within a few weeks afterward, and the sellers filed a proof of claim based on the purchase note. The buyers subsequently commenced an adversary proceeding seeking rescission of the asset purchase agreement. On December 29, 1998, the sellers' attorney issued a subpoena to attorney Saunders, who formerly represented the buyers in drafting the asset purchase agreement. The subpoena demanded production of voluminous documents requiring review under the attorney-client privilege by December 31, 1998. The bankruptcy court later quashed the subpoena because it failed to allow a reasonable time for compliance, because

7

it required disclosure of privileged matter, and because it subjected Saunders to an undue burden. See Fed. R. Civ. P. 45(c)(3)(A)(i), (iii), (iv). On July 28, 1999, the bankruptcy court conducted a hearing on the imposition of Rule 45 sanctions against the sellers' attorney for issuing the December 29, 1998 subpoena on Saunders. The bankruptcy court determined that the subpoena subjected Saunders to an undue burden and awarded attorney fees to Saunders in the amount of $1,432.25.

The trial in the adversary proceeding below was held in February and March of 1999. On June 25, 1999, the bankruptcy court issued a memorandum detailing its findings of fact and conclusions of law.[2] The bankruptcy court specifically found (1) that "the financial statements that had been given to the buyers did not fairly present the financial condition of the company"; (2) that "there had been a material adverse change in the company's financial condition and operations between December 31, 1996, and March 31, 1997"; (3) that "the representations of financial condition made by the Sellers omitted material facts necessary to make the statements not misleading"; and (4) that since the company was in a financial tailspin at the date of closing, the company had no value as a going concern at that time. The bankruptcy court concluded that the sellers were liable to the buyers under two alternative theories–breach of contract and fraud. Attorney fees and costs were awarded to the buyers based on a provision in the asset purchase agreement granting this relief to the buyers.

In addition, the bankruptcy court concluded that ratification, waiver, and laches did not preclude the remedy of rescission. Further, the bankruptcy court determined that rescission was not precluded in this case by the inability to perfectly restore the sellers to their pre-closing position. Accordingly, the bankruptcy court awarded rescission of the contract, making James and Randy jointly and severally liable for returning the money the buyers paid for the business.

On July 28, 1999, the bankruptcy court conducted a hearing with respect to crafting its rescission order in greater detail. On August 5, 1999, the bankruptcy court issued a

---

[2]On the same date, the bankruptcy court also issued a separate order equitably and contractually subordinating the sellers' claim in the instant bankruptcy case to that of Signal Bank.

memorandum specifying that the buyers were to receive back their downpayment of $375,000, the 9 monthly payments they made on the purchase note totalling $94,056.75, and $22,500 in payments they made toward the consulting and noncompete agreements. Also, the sellers were to receive back all "purchased assets" which remained in the buyers' possession. "Purchased assets" were defined by the bankruptcy court to include

> only those assets subject to the Asset Purchase Agreement which remain property of the Plaintiff, including in particular all specific accounts receivable that were in existence as of the time of the Asset Purchase Agreement and remain unpaid, all specific inventory that was in existence as of the time of the Asset Purchase Agreement and remains unsold by Plaintiff, and all specific equipment that was in existence as of the time of the Asset Purchase Agreement and that remains property of the Plaintiff. Receivables that became due after the date of the Asset Purchase Agreement, inventory that was acquired after the Asset Purchase Agreement, and equipment that was purchased after the Asset Purchase Agreement, are not "Purchased Assets."

The memorandum of August 5, 1999 also amended the bankruptcy court's previous findings of fact and conclusions of law to disallow the previous award of attorney fees and costs to the buyers. The bankruptcy court did so on the grounds that rescission treats the contract as if it had never existed. Thus, the buyers were not allowed to retain the benefit of the attorney fees provision of the asset purchase agreement because the contract was deemed void *ab initio*. Finally, the bankruptcy court declined to impose a constructive trust on the monies which the sellers received from the buyers because the buyers had not pointed to specific assets to which the trust might attach.

The sellers appeal from the bankruptcy court's June 25, 1999 and August 5, 1999 memorandum orders. Specifically, they assert the following as error: that the record is insufficient to support the bankruptcy court's findings of fraud and breach of contract; that the bankruptcy court improperly applied rescission to this case; that the bankruptcy court's imposition of liability was improper with respect to Randy; and that the bankruptcy court abused its discretion in awarding sanctions against attorney Christopher A. Grove under Rule 45 of the Federal Rules of Civil Procedure. The buyers similarly appeal, contending that the bankruptcy court erred in failing to impose a constructive trust on the money they paid to the sellers and in failing to award them their attorney fees and costs.

STANDARD OF REVIEW

On appeal, we review the bankruptcy court's findings of fact for clear error and its conclusions of law *de novo.* Bankr. R. 8013; Gourley v. Usery (In re Usery), 123 F.3d 1089, 1093 (8th Cir. 1997); O'Neal v. Southwest Mo. Bank (In re Broadview Lumber Co.), 118 F.3d 1246, 1250 (8th Cir. 1997). "A district court's choice between two permissible views of the evidence cannot be clearly erroneous." Estate of Davis by Ostenfeld v. Delo, 115 F.3d 1388, 1393-94 (8th Cir. 1997) (citing Moody v. Proctor, 986 F.2d 239, 241 (8th Cir. 1993)). "Reversal is appropriate if the bankruptcy court misunderstood or misapplied the law." Usery, 123 F.3d at 1093.

DISCUSSION

1. Breach of Contract

There is sufficient evidence to support the bankruptcy court's finding that the sellers breached the disclosure warranties contained in the asset purchase agreement at paragraph 5.4, paragraph 5.6.1, and paragraph 5.27. Paragraph 5.4 contained the sellers' warranty that the 1996 financial statement provided to the buyers fairly presented the financial condition of the business. Paragraph 5.27 contained the sellers' warranty that the statements which the sellers provided to the buyers did not omit material facts necessary to make those statements not misleading. The 1996 financial statement depicted a profitable business that had earned over $100,000 in net income that year. However, as the record shows, the business had entered a tailspin which resulted in losses over the last three quarters of 1996. Though it may have started out as a profitable business in the first quarter of 1996, that certainly was not the trend for the rest of the year. By the end of 1996, Abacor was in serious financial trouble, and the financial statement given to the buyers did not reflect that reality. Thus, the 1996 financial statement did not fairly represent the financial condition of the company and omitted facts necessary to make it not misleading under the circumstances. Accordingly, we affirm the bankruptcy court's finding that the sellers breached paragraphs 5.4 and 5.27 of the asset purchase agreement.

Paragraph 5.6.1 contained the sellers' warranty that no material adverse change had occurred in Abacor's financial condition, operations, or results of operations after December 31, 1996. However, the financial statements depicting Abacor's historical performance since 1991 indicated that Abacor's first quarter was typically its strongest quarter of the year. During the first quarter of 1996, Abacor earned over $139,000 in net income. In contrast, Abacor earned under $38,000 in net income during the first quarter of 1997, and the record also shows that during this period Abacor booked a gain of $63,598.25 after returning some inventory to its manufacturer. Absent that return of inventory, Abacor's operations resulted in a loss for the first quarter of 1997, and that reflects a dramatic change from Abacor's historical performance during the same quarter in previous years. Accordingly, we affirm the bankruptcy court's finding that the sellers breached paragraph 5.6.1 of the asset purchase agreement.

## 2. Intentional Misrepresentation

In the adversary proceeding below, the buyers' complaint asserted a cause of action for fraudulent or intentional misrepresentation, alleging that the sellers knowingly misrepresented the financial condition of the software business. In Minnesota, the terms "fraudulent misrepresentation" and "intentional misrepresentation" are synonymous, requiring proof of the following elements:

1. There must be a representation;
2. That representation must be false;
3. It must have to do with a past or present fact;
4. That fact must be material;
5. It must be susceptible of knowledge;
6. The representer must know it to be false, or in the alternative, must assert it as of his own knowledge without knowing whether it is true or false;
7. The representer must intend to have the other person induced to act, or justified in acting upon it;
8. That person must be so induced to act or so justified in acting;
9. That person's action must be in reliance upon the representation;
10. That person must suffer damage;
11. That damage must be attributable to the misrepresentation, that is, the statement must be the proximate cause of the injury.

11

See Florenzano v. Olson, 387 N.W.2d 168, 174 n.4 (Minn. 1986); M. H. v. Caritas Family Services, 488 N.W.2d 282, 289 (Minn. 1992). "A misrepresentation may be made either (1) by an affirmative statement that is itself false or (2) by concealing or not disclosing certain facts that render the facts that are disclosed misleading." Caritas Family Services, 488 N.W.2d at 289.

The sixth element listed above defines the fraudulent intent required to establish intentional misrepresentation. Florenzano, 387 N.W.2d at 174. "Fraudulent intent" refers to the "misrepresenter's knowledge of the untrue character of his or her representations." Id. at 173 n.2. "Fraudulent intent is, in essence, dishonesty or bad faith." Id. at 173. Fraudulent intent has also been characterized as intent to "deceive" or "mislead." See M. H. v. Caritas Family Services, 488 N.W.2d 282, 289 (Minn. 1992) (in the absence of evidence that the misrepresentations were intended to mislead the plaintiffs, evidence was insufficient as a matter of law to establish intentional misrepresentation). As the Supreme Court of Minnesota explained:

> There is no doubt of fraudulent intent when the misrepresenter knows or believes the matter is not as he or she represents it to be. Fraudulent intent is also present when a misrepresenter speaks positively and without qualification, *but either is conscious of ignorance of the truth, or realizes that the information on which he or she relies is not adequate or dependable enough to support such a positive, unqualified assertion.*

Florenzano, 387 N.W.2d at 173 (italics added).

In the case at bar, the same facts which support the conclusion that the sellers breached the disclosure warranties contained in the asset purchase agreement also support the conclusion that the sellers misrepresented the financial condition of the software business. However, there is insufficient evidence to support a finding of intentional misrepresentation in this case because there is little evidence, if any, of fraudulent intent on the part of the sellers. The evidence indicates that the sellers did not devote much time to keeping accurate current financial records and that the sellers made representations as to how well the business was doing based on their "gut feeling." Although the bankruptcy court found that the sellers had no direct knowledge that their representations were false, the

12

bankruptcy court nevertheless found that the sellers committed intentional misrepresentation because they spoke without any real knowledge as to the truth or falsity of their representations. However, where a person speaks without knowledge of the representation's truth or falsity, fraudulent intent exists only if the speaker is consciously aware of his or her lack of knowledge. In this case, it is undisputed that the sellers did a poor job of financial record-keeping. Furthermore, even though Abacor began losing money in the second quarter of 1996, the company was still able to sell a good deal of software and managed to keep a significant amount of cash in the bank. At the time of closing, Abacor had approximately $70,000 in the bank which was not included in the asset purchase agreement. Thus, in the absence of good financial record-keeping, Abacor had the outward appearance of a financially healthy business. Indeed, this outward appearance of financial stability must have been a significant factor in motivating the buyers to purchase the business since much of the documentation the buyers requested for due diligence was never provided. In addition, we note that the bankruptcy court made a specific finding that the sellers' conduct was not "insidious," but that the sellers' failure to provide more and better financial information to the buyers was largely due to poor bookkeeping.[3] In our view, finding that the sellers' conduct was not "insidious" was equivalent to finding that the sellers' conduct was not intended to deceive or mislead. Therefore, the evidence in this case fails to establish fraudulent intent.

The bankruptcy court cited In re Strid, 487 N.W.2d 891, 895 (Minn. 1992) for the proposition that fraudulent intent, or intent to deceive, is unnecessary to establish liability for intentional misrepresentation. However, that proposition is inconsistent with the Florenzano and Caritas Family Services decisions. In addition, the quoted text from Strid upon which the bankruptcy court relied seems to have been taken somewhat out of context.[4]

---

[3]We recognize that the bankruptcy court made this finding with respect to the sellers' failure to provide the buyers a financial statement for 1995 until September of 1996. However, the primary reason for the delay cited by the bankruptcy court–poor bookkeeping–applies equally to the sellers' general failure to provide adequate financial information throughout the negotiations period prior to closing.

[4]The quoted text: "Fraud does not require an intent to cause damage that is contemporaneous with the false representation. It requires only an intent, at the time of

13

It appears that the language quoted from <u>Strid</u> was addressing an argument about "intent to cause contemporaneous damage," which is clearly not required to establish intentional misrepresentation. Moreover, the present case may be distinguished from <u>Strid</u>. Unlike the case at bar, the misrepresenter in <u>Strid</u> *knew* the representation was false at the time he made it, and fraudulent intent is clearly established under such circumstances. <u>Florenzano</u>, 387 N.W.2d at 173. Thus, <u>Strid</u> is not analogous to the case at bar, and its precedential value in this instance is somewhat questionable, especially in light of the fact that <u>Strid</u> contains no real analysis of the fraudulent intent issue. Thus, <u>Strid</u> warrants less consideration than <u>Florenzano</u> and its progeny.

Based on the foregoing, we conclude that there was insufficient evidence to establish fraudulent intent on the part of the sellers. Accordingly, the evidence is insufficient as a matter of law to support a finding that the sellers committed intentional misrepresentation, and we must reverse the bankruptcy court's finding on this issue.[5]

### 3. Rescission

Rescission, an equitable remedy, is available in breach of contract cases when the injury resulting from a material breach is irreparable, when damages at law are inadequate, or when such damages would be difficult or impossible to determine. <u>Marso v. Mankato Clinic, Ltd.</u>, 153 N.W.2d 281, 290 (Minn. 1967); <u>Johnny's, Inc. v. Njaka</u>, 450 N.W.2d 166,

the representation, that the other person act on it." <u>Strid</u>, 487 N.W.2d at 895. In the quoted text, we believe the <u>Strid</u> court is referring to another element of intentional misrepresentation which states that the misrepresenter must intend to induce action by the other person. <u>See</u> <u>Florenzano</u>, 387 N.W.2d at 173 n.2. The intent to induce action should not be confused with the requirement of fraudulent intent (or intent to deceive), which exists as a separate and distinct element of intentional misrepresentation.

[5]The facts of this case would appear sufficient to establish negligent misrepresentation on the part of the sellers. <u>See</u> <u>Bonhiver v. Graff</u>, 248 N.W.2d 291, 298-99 (Minn. 1976) (discussing negligent misrepresentation). However, the buyers did not plead a cause of action for negligent misrepresentation, and this issue was neither briefed nor argued before the bankruptcy court or before this Court on appeal. Therefore, the issue is not properly before us, and we make no determination of it.

168 (Minn. Ct. App. 1990); 8 Dunnell Minn. Digest Contracts § 11.01(b) (4th ed. 1990). Minnesota's rule regarding the applicability of rescission in breach of contract cases comports with the long-standing principle that equitable relief is only available when damages at law are inadequate. See 27A Am.Jur.2d Equity § 30 (1996).

In the case at bar, the bankruptcy court failed to make any findings that damages at law were inadequate, that damages would have been difficult or impossible to determine, or that the buyers were irreparably harmed. Without such a finding, the equitable remedy of rescission is not available under Minnesota law. Since there has been no finding which satisfies this threshold question, we reverse the bankruptcy court's decision to apply the remedy of rescission and remand the case to the bankruptcy court so that such a finding can be made. In the event that no such finding can be made on remand, the bankruptcy court must determine the buyers' damages at law and impose that remedy in lieu of rescission.[6]

In addition, the sellers contest the applicability of rescission in this case by raising the issues of ratification, waiver, and restoration of the pre-closing status quo. On remand, if the bankruptcy court makes a threshold determination that damages are inadequate or difficult to determine, or that the buyers have been irreparably harmed, then these arguments by the sellers will become viable. Therefore, we will take this opportunity to review the bankruptcy court's determination of these issues.

*a. Ratification and Waiver*

The sellers argue that the remedy of rescission is not available in this case because the buyers allegedly waived their right to rescind the asset purchase agreement and ratified the transaction by continuing to operate the computer software business for several months after closing the sale. The bankruptcy court concluded that there was no unreasonable delay on the part of the buyers in seeking to rescind because they did not have full knowledge of the nature and extent of the facts giving rise to their right to seek rescission until just prior to the

---

[6]See B.F. Goodrich Co. v. Mesabi Tire Co., 430 N.W.2d 180, 182-83 (Minn. 1988) (discussing Minnesota's "out-of-pocket" rule for determining damages in similar cases).

15

adversary proceeding giving rise to the present appeal. Thus, the bankruptcy court determined that ratification and waiver had not been established.

"Any act of ratification of a contract *after knowledge of facts authorizing a rescission* amounts to an affirmance, and terminates the right to rescind." Parsons v. McKinley, 57 N.W. 1134, 1134 (Minn. 1894) (emphasis added).

> One claiming that a contract was obtained by fraud, promptly must elect to rescind or be denied that relief on the ground of ratification. If one proceeds to execute the contract, or receive the benefit under it, *knowing that he is being defrauded*, or if he in any way recognizes it as a subsisting and binding agreement, he will be deemed to have affirmed the contract and waived his right to rescind.

Northern Pacific Railway Co. v. United States, 70 F. Supp. 836, 865 (D. Minn. 1946) (emphasis added). "A right to rescind must be exercised within a reasonable time after discovery of the facts from which the right arises." Id.; Parsons, 57 N.W. at 1134; Hemming v. Ald, Inc., 155 N.W.2d 384, 387 (Minn. 1967). The point of discovery is the time at which the party seeking to rescind acquires actual knowledge of the nature and extent of the grounds for rescission. Hemming, 155 N.W.2d at 387. Acts in recognition of the existence of a contract, which are performed before discovery of the grounds for rescission, do not constitute affirmance or ratification. Kraus v. Thompson, 14 N.W. 266, 267 (Minn. 1882).

Waiver is the voluntary and intentional relinquishment of a known right. Montgomery Ward & Co. v. County of Hennepin, 450 N.W.2d 299, 304 (Minn. 1990); Blankholm v. Fearing, 22 N.W.2d 853, 856 (Minn. 1946). Waiver may be implied from conduct. Blankholm, 22 N.W.2d at 856. The right to rescind a contract may be waived by continuing to treat the contract as a subsisting obligation. Cut Price Super Markets v. Kingpin Foods, Inc., 98 N.W.2d 257, 267 (Minn. 1959). Waiver must be manifested in some unequivocal manner. Ohio Confection Co. v. Eimon Mercantile Co., 191 N.W. 910, 911 (Minn. 1923). Both intent and knowledge are essential elements of waiver. Clark v. Dye, 197 N.W. 209, 212 (Minn. 1924). "To establish a waiver or ratification of fraud, there must be evidence that the waiving party had full knowledge of the facts and his or her legal rights, and intended to relinquish these rights." Carpenter v. Vreeman, 409 N.W.2d 258, 262 (Minn. Ct. App.

1987).

In the case at bar, the sellers removed from the business site all the financial documents which might have conclusively established that misrepresentations about the company's financial performance had been made. Although the buyers may have suspected that misrepresentations had been made before they ultimately brought the adversary proceeding seeking rescission, they had insufficient knowledge of the facts to support such a conclusion at an earlier date. Indeed, since the financial records were missing, the buyers had to hire accountants in an attempt to reconstruct the financial history of the software business prior to its sale. None of the historical financial documents necessary to discover or confirm the grounds for rescission in this case were made available to the buyers until the discovery phase of the adversary proceeding below. Under these circumstances, the buyers' actions in continuing to operate the software business and in continuing to make payments to the sellers on the purchase note cannot be considered a ratification of the asset purchase agreement or a waiver of the right to rescind because the buyers had not yet acquired sufficient knowledge of the nature and extent of the facts giving rise to the grounds for rescission. Accordingly, we affirm the bankruptcy court's ruling with respect to ratification and waiver.

### b. Restoration of the Pre-Closing Status Quo

The sellers argue that rescission is improper in this case because they cannot be restored to their pre-closing position. However, under the circumstances of this case, the bankruptcy court concluded that rescission could not be precluded on this basis, and we agree. Generally, rescission requires that the parties be placed in the same positions they occupied prior to the contract. Johnny's, Inc. v. Njaka, 450 N.W.2d 166, 168 (Minn. Ct. App. 1990); Village of Wells v. Layne-Minnesota Co., 60 N.W.2d 621, 625 (Minn. 1953); Darelius v. Commonwealth Mortgage Co., 188 N.W. 208, 211 (Minn. 1922). However, as the Minnesota Supreme Court explained,

> [T]his rule is not invariable. It is founded on the principle that 'he who seeks equity must do equity,' and, whenever under the circumstances of the particular case, restitution by plaintiff is not essential to the complete

administration of justice between the parties, it will not be required.  The rule goes no farther than justice requires.

Village of Wells, 60 N.W.2d at 625 (quoting Darelius, 188 N.W. at 211).  "[I]mpossible or unreasonable things, which do not tend to accomplish equity in the particular transaction, are not required."  Beck v. Spindler, 99 N.W.2d 684, 685 (Minn. 1959) (quoting Proper v. Proper, 237 N.W. 178, 179 (Minn. 1931) (citation omitted)).  Courts are primarily concerned with restoring the status quo of the victim of misrepresentations rather than the misrepresenter.  Hirschman v. Healy, 202 N.W. 734, 735 (Minn. 1925).  Rescission does not require the return of worthless property.  Village of Wells, 60 N.W.2d at 625; Darelius, 188 N.W. at 211.

In this case, a perfect restoration of the sellers' pre-closing position is impossible given the current state of the software business, and under Minnesota law, impossible or unreasonable things are not required.  Moreover, such a restoration is not necessary for the complete administration of justice between the parties because the buyers essentially received no value in return for the money they paid the sellers.  The bankruptcy court found that the software business had no going concern value at the time of sale.  Furthermore, the bankruptcy court ruled that the sellers' claim in the instant bankruptcy case was equitably and contractually subordinated to  Signal Bank's claim, which was apparently greater than the value of the remaining equipment and assets of the business.  Thus, a substantial restoration of the sellers to their pre-closing position would require that the sellers receive a business worth nothing and assets that essentially belong to the bank.  As noted above, worthless property need not be returned.  Accordingly, we affirm the bankruptcy court's ruling that the remedy of rescission is not precluded in this case by the inability to perfectly restore the sellers to their pre-closing position.

### 4. Constructive Trust

A constructive trust arises in favor of the person equitably entitled to property whenever legal title is obtained through improper means such as fraud, oppression, duress, undue influence, force, crime, or taking improper advantage of a confidential or fiduciary relationship.  Hanson v. FDIC, 13 F.3d 1247, 1253 (8th Cir. 1994) (applying Minnesota

law). However, a prerequisite to imposition of a constructive trust is the existence of an identifiable *res* and its possession by the party to be charged as the constructive trustee. See Chiu v. Wong, 16 F.3d 306, 309-10 (8th Cir. 1994); Rock v. Hennepin Broadcasting Association, Inc., 359 N.W.2d 735, 739-40 (Minn. Ct. App. 1984); Shields v. Duggan (In re Dartco, Inc.), 197 B.R. 860, 867 (Bankr. D. Minn. 1996). In addition, there must be clear and convincing evidence that the imposition of a constructive trust is justified to prevent unjust enrichment. Rock, 359 N.W.2d at 739 (citing In re Estate of Eriksen, 337 N.W.2d 671, 674 (Minn. 1983)). Unjust enrichment is the knowing receipt and unjust retention of something of value to which one is not entitled. Southtown Plumbing, Inc. v. Har-Ned Lumber Co., 493 N.W.2d 137, 140 (Minn. Ct. App. 1992).

In the case at bar, the buyers have failed to identify a specific trust *res* that remains in the hands of the sellers. Therefore, the bankruptcy court properly denied the buyers' request for imposition of a constructive trust on that basis. As a further note, it is not clear whether a constructive trust may be imposed merely for a breach of contract. As indicated above, some type of intentional wrongdoing other than a breach of contract is usually necessary, and at least one other jurisdiction specifically declines to impose constructive trusts in pure breach of contract cases. See Amendola v. Bayer, 907 F.2d 760 (7th Cir. 1990).

5. Randy Lostetter's Liability

The bankruptcy court imposed joint and several liability on James Lostetter, Randy Lostetter, and Abacor, Inc. Although the bankruptcy court's reasons for doing so were not explicitly stated in its opinion and order of June 25, 1999, the bankruptcy court did note in its findings of fact that the asset purchase agreement provided for joint and several liability to be borne by Abacor and its shareholders in the event of breach.[7] Regardless of this

---

[7] We note that this contract provision would be inapplicable if the bankruptcy court, on remand, makes a threshold determination that rescission is appropriate. See Hatch v. Kulick, 1 N.W.2d 359, 360 (Minn. 1941) (rescission abolishes the contract and treats the parties as if such contract had never existed). However, if the bankruptcy court makes the opposite threshold determination on remand, then the contract provision would become applicable, supplying an additional basis for imposing liability on Randy.

19

contract provision, however, Randy is liable for breach of the asset purchase agreement.

In general, only the parties to a contract have rights and obligations under that contract. See Veerkamp v. Farmers Co-op Creamery, 573 N.W.2d 715, 717-18 (Minn. Ct. App. 1998). When an agent enters a contract on behalf of a disclosed principal, the contract binds the principal. See Kost v. Peterson, 193 N.W.2d 291, 294 (Minn. 1971).

In the case at bar, the appellants argue that Randy should not be held liable for breach of the asset purchase agreement because he did not sign the contract and was less involved with the negotiations than James. However, James signed the asset purchase agreement as "President" and as the "Shareholders' Agent," thus binding Abacor's shareholders to the contract. Indeed, the signature page of the agreement lists the names of the shareholders, and Randy Lostetter's name expressly appears on the list. As a shareholder, Randy was a disclosed principal, and James' signature in his capacity as the shareholders' agent was sufficient to bind Randy to the contract. Accordingly, Randy Lostetter was a party to the asset purchase agreement and remains liable for its breach.

## 6. Attorney Fees

As the bankruptcy court noted, litigants may not recover attorney fees absent a specific contractual or statutory provision granting that right. Osborne v. Chapman, 574 N.W.2d 64, 68 (Minn. 1998). Here, the bankruptcy court's original award of attorney fees to the buyers was based on a contractual provision in the asset purchase agreement. However, the court reversed its own prior award of fees because it was based on a contract that had been rescinded and thus treated as if it never existed. See Hatch v. Kulick, 1 N.W.2d 359, 360 (Minn. 1941).

As previously discussed, we are remanding this case for a threshold determination as to whether the equitable remedy of rescission is appropriate, and the outcome of that determination will affect the issue of attorney fees and costs. Accordingly, we reverse the bankruptcy court's ruling on this issue and remand the case for further proceedings. If rescission is inappropriate, then the contract provision allowing for the award of attorney fees and costs becomes applicable, and those items may be awarded to the buyers.

20

Alternatively, if rescission is appropriate, then attorney fees and costs should be denied.

## 7. Imposition of Sanctions on Sellers' Counsel

Rule 45 of the Federal Rules of Civil Procedure applies in bankruptcy cases. Bankr. R. 9016. Rule 45 generally imposes a duty on the issuer of a subpoena to take reasonable steps to avoid imposing an undue burden or expense on a person subject to the subpoena. Fed. R. Civ. P. 45(c)(1). In addition, the rule specifically provides the following: "The court on behalf of which the subpoena was issued *shall* enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee." Id. (italics added). Appellate review of a decision pursuant to Fed. R. Civ. P. 45(c) is subject to the abuse of discretion standard. See Miscellaneous Docket Matter #1 v. Miscellaneous Docket Matter #2, 197 F.3d 922, 925 (8th Cir. 1999) (abuse of discretion standard applies when reviewing a decision to quash a subpoena under Fed. R. Civ. P. 45(c)).

In the case at bar, the sellers' attorney served a subpoena dated December 29, 1999 on Jeffrey Saunders, an attorney and non-party witness who formerly represented the buyers in drafting the asset purchase agreement. At the time, Saunders was in the midst of his busiest time of the year as a mergers and acquisitions practitioner. The subpoena demanded production of a litany of documents requiring review under the attorney-client privilege, and the date for production was December 31, 1999, giving Saunders a mere 48 hours to comply. Given these circumstances, the bankruptcy court did not abuse its discretion in finding that the subpoena issued by the sellers' counsel imposed an undue burden on Saunders. Accordingly, sanctions were appropriate under Fed. R. Civ. P. 45(c), and we affirm the bankruptcy court's award of attorney fees to Saunders in the amount of $1,432.25.

## CONCLUSION

For the reasons discussed, we reverse the bankruptcy court with respect to its finding of intentional misrepresentation, its decision to apply the remedy of rescission, and its decision with respect to the award of attorney fees. We affirm the bankruptcy court in all other respects. The case is remanded for further proceedings consistent with this opinion.

A true copy.

Attest:

        CLERK, U.S. BANKRUPTCY APPELLATE PANEL,
        EIGHTH CIRCUIT.